**In the Interest of C.P.V.Y., B.Y. and C.C.P.L.**

**No. 09–09–00248–CV.**

Court of Appeals of Texas, Beaumont.

Submitted April 5, 2010.

Decided June 24, 2010.

R.App. P. 47.1.

Marva Provo, Beaumont, for appellant.

Gerry Williams, TDFPS General Counsel, Trevor A. Woodruff, Appellate Atty., Austin, for appellee.

Before McKEITHEN, C.J., GAULTNEY and HORTON, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

M.P. appeals the termination of his parental rights to the minor children C.P.V.Y., B.Y. and C.C.P.L. M.P. raises seven issues for our consideration. In issues one through five, M.P. attacks the legal and factual sufficiency of the evidence supporting the trial court's findings. In issue six, M.P. asserts that the trial court violated his constitutional rights by terminating his parental rights when he was unable to be physically present during the trial. In issue seven, M.P. argues that the trial court violated his constitutional rights by denying his motion to continue the trial until he could participate. We affirm the trial court's judgment.

PROCEDURAL BACKGROUND AND EVIDENCE

The Department of Family and Protective Services (hereinafter "CPS") filed a petition to terminate M.P.'s parental rights to C.P.V.Y., B.Y. and C.C.P.L. The trial court granted the writ of habeas corpus ad testificandum filed by M.P. so that he could be physically present for trial. When the jury trial began, M.P., who was incarcerated in a federal prison in Kentucky, participated in the proceedings by telephone. M.P. did not object on the first day of trial to being unable to be physically present.

The State's first witness was CPS investigative worker Runday Hodge. On February 22, 2005, Hodge encountered C.P.V.Y., B.Y. and C.C.P.L., as well as their two half siblings, after someone reported that C.C.P.L. and his half sister had been seen soliciting for sex in the parking lot of a business. CPS eventually located the children and their grandmother in a motel room in Beaumont. The children's grandmother told Hodge that the family was in Beaumont due to a death in the family, and that the family had come to Beaumont on the way to Las Vegas for a funeral. In addition, grandmother provided a false name to Hodge. Grandmother informed CPS that she was the primary caretaker of the children. Hodge testified that she worked on the children's case for about two and a half months after the children were removed, and although she requested the children's birth certificates, school records, and immunization records, she never received them. According to Hodge, when CPS became involved in the case, some of the children had dyed hair, and they had head lice.

CPS foster care worker Kimberly Landry testified that she was assigned to the case involving C.P.V.Y., B.Y. and C.C.P.L. According to Landry, after C.C.P.L. was born, CPS took C.C.P.L. directly from the hospital into foster care. C.C.P.L. has been placed with the same foster family since birth, and CPS intends for that fami-

ly to adopt C.C.P.L. Landry explained that she had difficulty obtaining identifying information from family members for the children, such as birth certificates, correct names, birth dates, and immunization records, so all three children had to be immunized. According to Landry, when the children came into foster care, they had lice and dyed hair. Landry explained that she questioned grandmother's truthfulness because grandmother claimed to be an FBI informant, working for the Houston Police Department, talked about her wonderful home, and talked about her fear that someone was attempting to kill her. When Landry contacted the Houston Police Department, she learned that grandmother's story was untrue. Landry testified she received one letter and approximately two phone calls from M.P. during the fourteen months that she handled the case.

According to Landry, she explained to M.P. in late 2005 that his children were in the care of CPS, and M.P. indicated that he wanted his children to be with his sister or to reunite with their mother. Landry testified that she had explained to M.P. why CPS had removed the children from their mother, but M.P. never expressed concern about returning the children to their mother. In a letter to CPS, M.P. provided a telephone number for his sister, and Landry testified that when CPS attempted to contact M.P.'s sister, the telephone had been disconnected.

Kimberly Shelton, a family based safety services supervisor for Jefferson County with CPS, testified that in 2007, she was the foster care worker in charge of the case involving C.P.V.Y., B.Y. and C.C.P.L., and she made the decision to place the children with grandmother in an effort to keep the children together. CPS temporarily placed the children with grandmother on March 22, 2007. Shelton testified that a few weeks later, she visited the home to check on the children, and "[e]verything looked really good. The house looked really good. The children were enrolled in school. She was providing for them." Shelton testified that when she visited the home again on April 17, 2007, to move the children's belongings to grandmother's house, the house "wasn't like I had seen it before. . . . [O]ne of the things that I noted was there was, like, a strong smell of bleach like that somebody had been working very hard to clean it. . . . [W]e noticed that the children were sick."

According to Shelton, at the beginning of May, she received numerous phone calls from grandmother indicating that grandmother was "having some trouble with the landlord over at the apartment complex and . . . she had reported to me that the mother had been over there a couple of times to see the children." Shelton testified that she also began hearing that grandmother might be evicted. On May 1, 2007, CPS and another caseworker decided to remove the children from grandmother, so Shelton and another caseworker, accompanied by law enforcement officers, went to remove the children and put them back into foster care. Shelton contacted grandmother by telephone, and grandmother stated that she was out searching for another apartment, told Shelton that the children were with her, and informed Shelton that she and the children should be back in approximately one hour. Shelton testified that she could hear the children in the background during her telephone conversation with grandmother. Shelton testified that she did not tell her she was there to remove the children, but simply told grandmother she wanted to see the children.

Shelton testified that grandmother had either seen the police or someone had warned grandmother that the CPS case-

workers were accompanied by the police, because grandmother "called me back and asked me why law enforcement was with me." According to Shelton, grandmother called again, said that they were running behind, and that they were getting ready for a birthday party. Grandmother called again and told Shelton that she should come to the birthday party, so the CPS caseworkers and law enforcement officers returned to the apartment between fifteen and thirty minutes later. Shelton explained that when she reached the door of the apartment, grandmother opened the door and stated that the children were not there because they were fishing with their mother in Galveston and would be back at 9:00 p.m.

According to Shelton, both CPS and law enforcement began investigating and attempting to locate the children, and the trial court held a special hearing to attempt to find the children. Shelton testified that on November 10, 2007, CPS received a call from grandmother, flew to Las Vegas, and retrieved C.P.V.Y., C.C.P.L., and one of their half siblings from the custody of Las Vegas CPS; however, B.Y. was not with them, and at the time of trial, B.Y. was still missing. Shelton explained that when she picked the children up in Las Vegas, their names had been changed. Shelton also testified that on the day the children disappeared, grandmother's apartment "was a mess. There was . . . food with open pots left in the sink. There was something that had been left in the oven that when the apartment manager opened it . . . it threw her back because the smell was so rancid." According to Shelton, M.P. never contacted her or sent any letters to the children while she was working on the case, and she explained that she worked on the case from March of 2007 until approximately

February of 2008. Due to prison regulations, M.P. was forced to get off the telephone at 4:00 p.m., during the cross-examination of Shelton by grandmother's counsel.[1]

Grandmother testified that M.P. "should have rights to his children" and should raise them. Grandmother opined that M.P. will support the children and care for them when he is released from prison. According to grandmother, she last saw M.P. seven or eight years ago. Grandmother explained that because she was living in another city, she did not see M.P. when he and her daughter conceived B.Y. in 2003 or C.C.P.L. in 2004. Grandmother testified that she told M.P. "that my daughter wasn't right because she's schizophrenic, delusional, . . . to leave her alone. . . ."

Grandmother explained that she told CPS that M.P. had "slapped her [daughter] a couple of times, but that was it." According to grandmother, there was "arguing and fighting[,]" but no one was hurt. Grandmother testified that M.P. worked and provided a home and food for the children "when he was there," but M.P. has been gone for seven or eight years. However, during cross-examination, grandmother admitted that she might be mistaken about the time frame, and M.P. might have only been incarcerated for five years. Grandmother explained that M.P. never really supported C.P.V.Y., B.Y. or C.C.P.L. In addition, grandmother explained that she accused M.P. of sexually abusing her daughter, C.C., who was eleven years old at the time, but grandmother now does not believe M.P. sexually abused C.C. Grandmother testified that the children's mother dyed their hair "because she felt that there was [sic] people watching them or looking for them."

---

1. This occurred on the first day of trial.

M.P. testified that he has been incarcerated since November 3, 2004, for felony possession of a firearm after pleading guilty and receiving a seventy-one-month sentence. M.P. explained that he had been convicted of burglary "four or five times" in 1998. M.P. testified that he has never met C.C.P.L. M.P. last saw B.Y. and C.P.V.Y. on the day he was incarcerated, when B.Y. was approximately one year old and C.P.V.Y. was approximately two and a half years old. M.P. testified that CPS notified him that his children were in CPS custody. M.P. explained that Landry wrote to him several times, and he contacted Landry by telephone, but "[r]ight now I can't pick up the phone whenever I want." In addition, M.P. testified that his disciplinary infractions while incarcerated had restricted his ability to contact the children. M.P. testified that he was unaware that the telephone number he had given Landry for his sister was not a working number.

M.P. stated he understood that despite his incarceration, he is still responsible for his children. When asked what he has done to show that he is maintaining responsibility for his children, M.P. testified, "to be honest with you, in the situation that I'm in right now, you know, there's really nothing I can do.... The social workers and family social services are taking care of my children for right now until I get out and to show you people that I'm willing to change and take care of my children." According to M.P., no one from his family has come forward to care for the children, although M.P. informed them by letter that the children were in foster care. When asked whether he had any family members other than his sister who could care for the children, M.P. testified, "not really." M.P. testified that his other relatives have numerous children of their own. M.P. testified that since 2005, he had only sent the children two cards. M.P. explained that he only acted as a parent to the children from February of 2002 until November of 2004.

According to M.P., when he entered federal custody, the children and their mother had an apartment, transportation, and food, and CPS was not involved with their lives. M.P. testified that he told the children's mother, "we are going to survive. We are going to make it. You have to do with what we got." M.P. testified that the children's mother "was supposed to get a job[,] and her mom was going to help her out, too." M.P. testified, "once I get out ... I'm going to do my best ... to get my kids back and show you people that I'm going to get their housing, register for school, food, clothing, shelter, and everything." In addition, M.P. testified, "I can't do nothing right here." M.P. explained that during his incarceration, he has taken anger management classes, business courses, parenting classes, and is working toward his G.E.D. M.P. denied ever placing his children in a surrounding that would endanger them physically or emotionally or leaving them with people who might endanger them physically or emotionally.

On the second day of trial, M.P.'s counsel noted that M.P. was unable to be present by telephone, and the following colloquy occurred between M.P.'s counsel and the trial court:

[Counsel]: Your Honor, very briefly, if we could.

[M.P.] is not available today. I just want to make, for the record, my objection of continuing the trial without his presence. He has a constitutional right to participate in these proceedings; therefore, we'd ask for a continuance until such time as he can be available again here by telephone.

THE COURT: I appreciate your dilemma. As I understand it, ... he's got some problems at the prison, and ... there was a lockdown, and there was a ... was it in the box or what was his term?

[Counsel]: I'm not sure of everything he said yesterday. But the last comment he made to me on the phone is his counselor is the person that's responsible for escorting him to a telephone and getting him that contact, and his counselor does not work today.

THE COURT: All right.

I'll deny your request for continuance.

[Counsel]: Thank you, Your Honor.

THE COURT: We are just several witnesses away from finishing up this matter. We have a jury, and we are going to go forward.

The State then called Rhonda Crim, a case supervisor with Court Appointed Special Advocates (CASA). Crim testified that she had dealt with the case involving C.P.V.Y., B.Y. and C.C.P.L. since they were initially removed on February 23, 2005. Crim testified that she agreed with the testimony of the CPS caseworkers. Crim opined that M.P.'s rights should be terminated. In addition, Crim explained that she has never recommended reunification of the children with the family because "I feel like that from the beginning there's been a lot of deceit, the information just wasn't there for us to be able to prove one way or another situations that were going on with the family as well as the lack of stability in the family environment." Crim testified that she was concerned about the stability of the home, and she stated that grandmother moved the children to different motels in unsafe parts of town. Crim testified that CASA plans for the children to be adopted by the foster families with whom they are currently placed. According to Crim, the families with whom C.P.V.Y. and C.C.P.L. are placed are stable, and the children are doing well there.

According to Crim, she has worked with many cases involving parents who were incarcerated. Crim testified that in some cases, incarcerated parents maintain significant ties with their children, either by written correspondence, telephone calls, or sending Christmas gifts. Crim explained that she was aware of three letters that M.P. had written to CPS concerning the children, and that she knew of two cards he had sent during a four-year period. Crim testified that, in her opinion, M.P. had not maintained significant contact with the children. In addition, Crim opined that if C.C.P.L. were reunited with M.P., it would be detrimental because C.C.P.L. is living with "the only family he knows."

Debbie Lee of CPS testified that beginning in May of 2006, she worked on the case involving C.P.V.Y., B.Y. and C.C.P.L. as both a foster care caseworker and supervisor. According to Lee, reunification is always CPS's initial goal. If reunification with the parents is impossible, CPS turns to the children's extended family. Lee testified that it is impossible to reunify children with a parent who is incarcerated. According to Lee, CPS routinely mails information to parents, such as plans of service, permanency reports, and court orders. Lee explained that CPS sent a letter to M.P. instructing him to send information about relatives, and CPS attempted to call the telephone number that M.P. provided for a relative. Lee testified that CPS received three letters from M.P. over a four-year period. Lee opined that M.P.'s conduct showed a "lack of interest" in the children, and she testified that M.P.'s incarceration and criminal history indicate that he is unable to provide the children with a safe environment. In addition, Lee opined that M.P. has not "tried

to keep his family together." Lee testified, "[f]or four and a half years I have been doing case planning for this case or our agency has been doing case planning for this case. If you are asking me if I think that's long enough to put children's lives on hold, I do."

The jury found that the relationship between M.P. and the children should be terminated, and the trial court signed a final termination order, in which it found by clear and convincing evidence that terminating the parent-child relationship between M.P. and the children is in the children's best interest. In its order, the trial court also found by clear and convincing evidence that M.P. had constructively abandoned the children; CPS had made reasonable efforts to return the children to M.P., M.P. had not regularly visited or maintained significant contact with the children; M.P. had demonstrated an inability to provide the children with a safe environment; and M.P. had knowingly engaged in criminal conduct that had led to his conviction, imprisonment, and resultant inability to care for the children for not less than two years from the date the petition was filed. The trial court's order terminated the parent-child relationship between M.P. and the children. M.P. then filed this appeal.

## ISSUE ONE

■ In his first issue, M.P. argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of the parent-child relationship is in the best interest of the children. Because involuntary termination of parental rights implicates fundamental constitutional rights and is both severe and permanent, the burden of proof at trial is clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001 (Vernon Supp.2009); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex.

1985). " 'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM.CODE ANN. § 101.007 (Vernon 2008). Before parental rights may be involuntarily terminated, the trier of fact must find by clear and convincing evidence (1) that the parent committed one of the statutory grounds found in section 161.001(1) of the Family Code, and (2) that termination is in the children's best interest. TEX. FAM.CODE ANN. § 161.001 (Vernon Supp.2009); *see also Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.1987).

In a legal sufficiency review, we consider all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which CPS bears the burden of proof. *In re J.L.*, 163 S.W.3d 79, 84–85 (Tex.2005). We assume the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could do so, and disregarded all evidence that a reasonable factfinder could have disbelieved. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). In a factual sufficiency review, we give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex.2002)). We consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* The evidence is factually insufficient if the disputed evidence is so significant that a factfinder could not have reasonably formed a firm belief or conviction as to its existence. *Id.*

In determining whether termination is in a child's best interest, the Supreme

Court has set forth a non-exhaustive list of factors: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex.1976). The party seeking termination need not prove that each *Holley* factor favors termination. *In re C.H.,* 89 S.W.3d at 27. The same evidence of acts or omissions used under section 161.001(1) may be probative in determining the best interests of the child. *In re A.A.A.,* 265 S.W.3d 507, 516 (Tex. App.-Houston [1st Dist.] 2008, pet. denied).

The factfinder heard evidence that when CPS became involved in the case involving the children, the children were soliciting for sex, they had head lice, and some of the children had dyed hair. The record also indicates that while the children were in grandmother's care, they disappeared after CPS informed grandmother they were waiting for grandmother at her home. All of the children were missing for several months, and B.Y. is still missing.

In addition, the record contains evidence that M.P. has been incarcerated since November 3, 2004, for felony possession of a firearm after pleading guilty and receiving a seventy-one-month sentence. The factfinder also heard evidence that M.P. had been convicted of burglary "four or five times" in 1998. Moreover, M.P. testified that he has never met C.C.P.L., and when

he was incarcerated, C.P.V.Y. was approximately two and a half years old, and B.Y. was approximately one year old. The factfinder also heard evidence that although M.P. provided CPS with the name and telephone number of his sister, who M.P. hoped would care for the children during his incarceration, the number M.P. provided for his sister had been disconnected. M.P. testified that other than the sister whom CPS had been unable to contact, he had no other family members who could care for the children during his incarceration, and M.P. testified that he is unable to care for the children while he is incarcerated.

The factfinder also heard evidence that M.P. had sent the children two cards during a four-year period, and a CASA case supervisor opined that M.P. had not maintained significant contact with the children. M.P. testified that his disciplinary infractions during his incarceration had restricted his ability to contact the children. A CPS caseworker testified that M.P.'s conduct demonstrated a lack of interest in the children. Furthermore, the factfinder heard evidence that C.P.V.Y. and C.C.P.L. are currently placed with stable foster families who want to adopt them, and the children are doing well with their foster families. Also before the factfinder was evidence that C.C.P.L. had been placed with the same foster family since birth. A CASA case supervisor also testified that reunification with M.P. would be detrimental to C.C.P.L. because C.C.P.L. is living with the only family he has ever known.

M.P. testified that when he is released from prison, he wants to seek employment and care for his children. In addition, M.P. explained that he has taken anger management classes, business courses, parenting classes, and is working toward his G.E.D. Grandmother testified that M.P. should retain his rights to the chil-

dren and raise them, and that M.P. would support the children and care for them when he is released from prison.

On this record, applying the appropriate standards of review, we hold that the evidence was legally and factually sufficient for a reasonable factfinder to form a firm belief or conviction that it was in the best interest of the children for M.P.'s parental rights to be terminated. Accordingly, we overrule issue one.

### ISSUES TWO, THREE, FOUR AND FIVE

■ In issues two through five, M.P. attacks the legal and factual sufficiency of the evidence supporting the trial court's findings that he failed to comply with the terms of a court order, that he constructively abandoned the children, that he cannot provide a safe environment for the children, and that CPS has made every reasonable effort to return the children to him. However, M.P. does not raise an appellate issue concerning the trial court's other stated basis for terminating M.P.'s parental rights: that M.P. knowingly engaged in criminal conduct that has resulted in the parent's conviction of an offense and confinement or imprisonment and inability to care for the children for not less than two years from the date of filing the petition. *See* TEX. FAM.CODE ANN. § 161.001(1)(Q). Once the best interest finding under section 161.001(2) is satisfied, the party seeking termination need prove only one of the termination grounds listed under section 161.001(1). TEX. FAM. CODE ANN. § 161.001; *In re A.V.*, 113 S.W.3d 355, 361 (Tex.2003). M.P. does not challenge the legal or factual sufficiency of the evidence supporting the trial court's finding under section 161.001(1)(Q); therefore, he has waived any complaint concerning the sufficiency of the evidence to support that finding. *See Toliver v. Tex. Dep't of Family and Protective Servs.*, 217

S.W.3d 85, 102–03 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Therefore, the trial court's termination order is supported by sufficient evidence, and we need not address issues two, three, four and five. *See id.*

### ISSUE SIX

■ In his sixth issue, M.P. argues that the trial court violated his rights under the U.S. Constitution and the Texas Constitution by terminating his rights when he was unable to be physically present at the trial. Specifically, M.P. argues that he was prejudiced because the factfinder "was not able [to] see him or his demeanor and judge his credibility." Trial counsel did not object to M.P. being able to appear only by telephone on the first day of trial. When M.P. was not permitted to appear telephonically on the second day of trial due to a lockdown at the prison, his attorney objected not to M.P.'s inability to be physically present, but to M.P.'s inability to be present by telephone. Therefore, M.P.'s trial objection does not comport with the issue he now raises on appeal. *See Moser v. Davis*, 79 S.W.3d 162, 169 (Tex.App.-Amarillo 2002, no pet.); TEX. R.APP. P. 33.1(a).

■ Even if M.P. had properly preserved the issue, he would not prevail. First, the trial court granted M.P.'s request for a writ of habeas corpus ad testificandum; however, because M.P. was incarcerated in a federal facility in another state, the trial court lacked the authority to compel M.P.'s attendance, and the federal government refused to honor the trial court's order. Second, in considering the need for an inmate's physical presence at trial, a court may evaluate

> the cost and inconvenience of transporting the prisoner to the courtroom; the security risk the prisoner presents to the court and public; whether the pris-

oner's claims are substantial; whether the matter's resolution can reasonably be delayed until the prisoner's release; whether the prisoner can and will offer admissible, noncumulative testimony that, cannot be effectively presented by deposition, telephone, or some other means; whether the prisoner's presence is important in judging his demeanor and credibility; whether the trial is to the court or a jury; and the prisoner's probability of success on the merits.

*In re Z.L.T.*, 124 S.W.3d 163, 165–66 (Tex. 2003). When M.P.'s counsel objected to M.P.'s unavailability by telephone on the second day of trial, counsel did not offer any evidence or argument concerning the above factors, nor did he explain why M.P.'s presence was necessary. CPS called only two witnesses (Crim and Lee) on the second day of trial, and M.P. had testified on the first day. M.P.'s counsel did not argue at trial that M.P.'s inability to participate by telephone left counsel unable to adequately represent M.P., nor does M.P. so argue on appeal. For all of these reasons, we overrule issue six.

## ISSUE SEVEN

■ In his seventh issue, M.P. asserts that the trial court violated his right to due process and due course of law by denying his oral motion for continuance. We review the granting or denial of a motion for continuance for an abuse of discretion. *Villegas v. Carter*, 711 S.W.2d 624, 626 (Tex.1986). We will not reverse the trial court's decision unless the trial court acted unreasonably or arbitrarily "without reference to any guiding rules and principles." *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex.1991) (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985)). Rule 251 provides as follows, in pertinent part: "No application for a continuance shall ... be granted except for sufficient cause sup-

ported by affidavit, or by consent of the parties, or by operation of law." TEX.R. CIV. P. 251. A trial court is presumed to have correctly exercised its discretion when it denies a motion that does not comply with the requirements of Rule 251 of the Texas Rules of Civil Procedure. *Villegas*, 711 S.W.2d at 626. In the instant case, counsel made only an oral motion for continuance, presumably due to evolving circumstances at trial concerning M.P.'s unavailability by telephone; therefore, the record does not contain an affidavit supporting the motion. On these facts, we presume that the trial court did not abuse its discretion by denying the motion. *See id.* However, we will nevertheless review M.P.'s constitutional contention.

■ As support for his argument, M.P. cites *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). To assess what process is due, courts weigh three factors: (1) the private interest affected by the proceeding or official action; (2) the countervailing governmental interest supporting use of the challenged proceeding; and (3) the risk of an erroneous deprivation of that interest due to the procedures used. *In re B.L.D.*, 113 S.W.3d 340, 352 (Tex.2003) (citing *Eldridge*, 424 U.S. at 335, 96 S.Ct. 893). The State has a compelling interest in preserving and promoting the welfare of the children. *Rodarte v. Cox*, 828 S.W.2d 65, 79 (Tex.App.-Tyler 1991, writ denied) (citing *Santosky v. Kramer*, 455 U.S. 745, 766, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). However, because termination of parental rights is traumatic, permanent, and irrevocable, any significant risk of erroneous deprivation is unacceptable. *In re M.S.*, 115 S.W.3d 534, 549 (Tex.2003).

Counsel's motion for continuance did not explain why M.P.'s telephonic presence on the second day of trial was necessary, nor

did counsel explain when M.P. might again be available to participate in the proceedings by telephone. In this case, applying the *Eldridge* factors, we hold that the trial court did not abuse its discretion by denying M.P.'s motion for continuance, nor did it violate M.P.'s rights to due process and due course of law. M.P. participated telephonically on the first day of trial without objection, and he testified as a witness. M.P.'s counsel did not object to proceeding with the remainder of the trial on the first day after M.P. had to get off the telephone at 4:00 p.m. In addition, although M.P. was unable to participate telephonically on the second day of trial due to a lockdown at the prison, M.P.'s counsel was present to mount a defense on M.P.'s behalf, and M.P.'s counsel cross-examined the witnesses and presented argument. For all of these reasons, we overrule issue seven and affirm the trial court's judgment.

AFFIRMED.