

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-19-00614-CV

**IN THE INTEREST OF B.G.R.**, a Child

From the 131st Judicial District Court, Bexar County, Texas
Trial Court No. 2018PA01873
Honorable Susan D. Reed, Judge Presiding[1]

Opinion by:     Luz Elena D. Chapa, Justice

Sitting:        Sandee Bryan Marion, Chief Justice
                Rebeca C. Martinez, Justice
                Luz Elena D. Chapa, Justice

Delivered and Filed: March 3, 2020

AFFIRMED

H.C. III[2] appeals the trial court's order terminating his parental rights to the child B.G.R.

We affirm the trial court's order.

### BACKGROUND

The Department of Family and Protective Services filed an original petition in August

2018, regarding five-day-old B.G.R. The Department sought emergency removal of the child, a

paternity determination as to H.C. III, conservatorship, and termination of both parents' rights.

The affidavit in support of the petition stated B.G.R.'s mother had tested positive for

amphetamines and methamphetamines when she was admitted to the hospital and the parents had

---

[1] Senior Judge, sitting by assignment
[2] To protect the identity of the minor child, we refer to the parents, grandmother, and the child by their initials. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

abandoned the child at the hospital, the mother having left the hospital against medical advice. In addition, the affiant stated she had been unable to locate the mother or the alleged father, H.C. III.

The trial court rendered an order for protection of the child, naming the Department temporary managing conservator of B.G.R., and appointed the child an attorney and guardian ad litem. The court also ordered substituted service on both parents by posting at the courthouse door, and appointed attorneys ad litem for them.

A Department caseworker was able to contact H.C. III by telephone in October 2018, two months after the case was filed. However, H.C. III was arrested soon thereafter and was sentenced to prison in November 2018. H.C. III filed an answer in April 2019.[3] H.C. III sought to establish paternity and requested the Department place B.G.R. with his mother. A caseworker visited H.C. III in prison in June 2019, and H.C. III signed his service plan.

The case proceeded to trial, at which one of the Department's caseworkers, appellant, and appellant's mother testified. After the bench trial, the trial court adjudicated H.C. III to be B.G.R.'s father and found by clear and convincing evidence that H.C. III engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child, constructively abandoned the child, and failed to comply with court-ordered provisions of the family service plan. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (N), & (O). The trial court also found by clear and convincing evidence that termination of his parental rights is in the child's best interest. *See id.* § 161.001(b)(2). The trial court terminated B.G.R.'s relationship with both parents and appointed the Department permanent managing conservator of B.G.R.

---

[3] The docket sheet reflects service by posting on H.C. III was executed and returned in September 2018, and that H.C. III was also personally served in prison in April 2019.

H.C. III timely appealed and argues the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(1)(E) of the Family Code and its finding that termination of his rights is in B.G.R.'s best interest.

**DISCUSSION**

**Standard of Review**

To terminate parental rights under section 161.001 of the Texas Family Code, the Department must prove by clear and convincing evidence one of the grounds in subsection 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001. In assessing the legal and factual sufficiency of the evidence to support the trial court's findings, we employ a heightened standard of review to determine whether the trial court could have formed a firm belief or conviction about the truth of the Department's allegations. *In re J.F.C.*, 96 S.W.3d 256, 266–67 (Tex. 2002). To determine whether this heightened burden of proof was met, we employ a heightened standard of review to determine whether a "factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "This standard guards the constitutional interests implicated by termination, while retaining the deference an appellate court must have for the factfinder's role." *In re O.N.H.*, 401 S.W.3d 681, 683 (Tex. App.—San Antonio 2013, no pet.). We do not reweigh issues of witness credibility but defer to the factfinder's reasonable credibility determinations. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam).

**Best Interest**

Under Texas law, there is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). However, a court must also presume that "the prompt and permanent placement of the child in a safe environment is . . . in the child's best interest." TEX. FAM. CODE § 263.307(a). In making a

best-interest determination, the factfinder looks at the entire record and considers all relevant circumstances. *See C.H.*, 89 S.W.3d at 27-29. In determining what is in the child's best interest, the court may consider evidence about the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the child; the plans for the child by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); *see C.H.*, 89 S.W.3d at 27. These factors are not exhaustive, and not every factor must be proved to find that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. Evidence of only one factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest. *Id.* at 28.

The Department initially became involved in this case when it was notified that the mother had tested positive for illegal drugs upon her admission to the hospital. Department case worker Jessica Deluna testified the testing results of B.G.R.'s meconium were positive for methamphetamines and marijuana and B.G.R. required treatment for the effects of the methamphetamines. When it received the referral, the Department determined that the child's parents, S.R. and H.C. III, were also the parents of a one-year-old daughter, A.C., on whom the Department had an open case. A.C. had been born drug-positive a year earlier, and the Department had placed A.C. with H.C. III's mother, V.C., for safety while the case was investigated. Deluna testified that V.C. allowed S.R. and H.C. III to take A.C. from V.C.'s home. She testified that, although law enforcement had been notified and A.C. had been placed on the Child Safety Check Alert List, *see* TEX. FAM. CODE § 261.3022, the Department had been unable to locate them and

had no contact with them until S.R. was admitted to the hospital to give birth to B.G.R. When the Department responded to the referral regarding B.G.R.'s birth, its investigator unsuccessfully attempted to obtain information about A.C.'s whereabouts from the parents at the hospital. Deluna testified, "the parents took off and left [B.G.R.] in the hospital."

Deluna testified the Department had not had any contact with S.R. at all after S.R. left the hospital. She testified H.C. III had a criminal history of evading arrest, possession of a controlled substance, and family violence. H.C. III was arrested after this case was filed, and subsequently imprisoned on charges of evading arrest and possession of a controlled substance. Deluna testified that since his arrest, H.C. III has refused to provide the Department any information about the whereabouts of A.C. and, at the time of trial, she still had not been located.

Deluna testified B.G.R. was treated for the side effects of methamphetamines and then placed in emergency foster care. She was later placed with a family that has adopted two of S.R.'s older children. Deluna testified the half-siblings are bonded with each other and the foster parent intends to adopt B.G.R. if the parents' rights are terminated. She testified that B.G.R.'s needs are being well-met in the foster home.

H.C. III's mother, V.C., testified she was at the hospital when B.G.R. was born and was there when B.G.R. was discharged to the Department investigator for foster care placement. V.C. testified she wanted B.G.R. placed with her and relayed her wishes to the investigator; however, the Department never contacted her. Deluna testified B.G.R. was not placed with V.C. because V.C. had been unable to ensure A.C.'s safety and had allowed the parents to abscond with A.C. while A.C. was in her care. Although V.C. maintained that she is not close to S.R., did not maintain contact with her, and did not know where A.C. was, Deluna testified V.C. told her she had been at the hospital for B.G.R.'s birth and had driven the parents when they left the hospital. V.C. testified that S.R. and H.C. III were "together" until shortly before H.C. III was arrested in October 2018.

Deluna testified the Department concluded V.C. was not trustworthy, and believed V.C. had maintained a relationship with S.R. and H.C. III during the time she knew the Department was looking for A.C., and had withheld information as to their whereabouts from the Department.

H.C. III testified he remained in a relationship with S.R. until shortly before B.G.R.'s birth. He asserted he learned from a friend that S.R. was in the hospital to give birth, and he then called his mother and asked her to "be present for [his] baby." H.C. III initially testified that during the year before this case was filed, he, S.R., and A.C. had lived together openly, and he did not know the Department was looking for A.C. However, he later admitted his mother had told him the Department was trying to find A.C. H.C. III testified he responded to this information by turning his phone off and refusing to take calls. He testified he had not spoken with S.R. recently and his daughter A.C. is "out of my life. I have nothing to do with her." At trial, he denied knowledge of her whereabouts.

H.C. III testified a caseworker found him and reached him by telephone in October 2018, while he was staying at a cousin's house. He testified he made arrangements to meet with the caseworker to discuss B.G.R. the following Monday and to take a drug test, but he was arrested on Sunday night. H.C. III was subsequently convicted of evading arrest and possession of a controlled substance (crystal methamphetamine) and sentenced to five years in prison. He testified he also had a prior conviction for family violence. H.C. III stated he believes he will be released on parole in 2020.[4]

H.C. III testified a caseworker visited him in prison and told him he had no chance of retaining custody of his daughter. He testified he received his service plan about three months before trial, but the caseworker did not review it with him. He stated he is on a waiting list for the

_____

[4] Deluna testified H.C. III had been denied parole in May 2019.

classes available at his unit. He testified he told the caseworker he wanted a DNA test and wanted B.G.R. to be placed with his mother.

H.C. III argues termination of his rights is not in B.G.R.'s best interest because he had made arrangements for his mother to care for her and because the Department did not use reasonable efforts to reunite B.G.R. with H.C. III. He contends he was not given a reasonable opportunity to comply with the service plan because he did not receive it until three months before trial, and the Department did not ensure services were available at the prison unit where he was housed.

We disagree. Even though H.C. III did not receive a service plan until late in the litigation, he was aware soon after B.G.R.'s birth that the Department had taken custody of her and placed her in foster care. H.C. III and S.R. left B.G.R. at the hospital and did not return, presumably to avoid contact with the Department. H.C. III's mother, with whom he was in contact, was present on the day B.G.R. was discharged from hospital to a Department investigator.

Yet H.C. III made no efforts to contact the Department, to inquire into B.G.R.'s health and safety, to ensure she was being cared for, or even to visit with her. He made no inquiry as to what he needed to do to obtain custody of B.G.R. or to have the child placed with his mother. It appeared to the Department that he was actively avoiding contact with them. When a caseworker was finally able to contact H.C. III by telephone in October, H.C. III would not disclose where he was living and said he would meet the caseworker several days later. H.C. III did not contact the Department or the court until six months after his arrest and eight months after B.G.R.'s birth. From the time of her birth through trial, H.C. III had not seen B.G.R. or provided support of any kind for her.

The trial court's finding that termination is in B.G.R.'s best interest is also supported by H.C. III's involvement with illegal drugs and his actions with respect to his older child, A.C. The Department had placed A.C. with H.C. III's mother, V.C., as part of a safety plan after both A.C.

and her mother, S.R., had tested positive for illegal drugs at A.C.'s birth. H.C. III and S.R. removed A.C. from V.C.'s home without permission and avoided further contact with the Department. H.C. III admitted at trial he had been living with S.R. and A.C. when he knew the Department was looking for them. The family's involvement with drugs did not abate while they were in hiding from the Department, as evidenced by B.G.R. being born positive for marijuana and methamphetamines and H.C. III being arrested for possession of crystal methamphetamines two months after B.G.R.'s birth.

H.C. III is also unable to provide a safe and stable environment for B.G.R. It is unknown when H.C. III will be released from prison and the trial court could have found from the evidence that V.C. was not an appropriate placement because she was unable to ensure B.G.R.'s safety. The Department had placed A.C. in V.C.'s care as part of a safety plan, and she had allowed the child to be taken by S.R. and H.C. III. Although V.C. testified she was not in contact with S.R. and did not know the whereabouts of S.R. or A.C., the trial court could have disbelieved her. H.C. III testified he was living with S.R. and A.C. during the year they were hiding from the Department, and the record supports he was in contact with his mother during that time. H.C. III also notified V.C. when S.R. was giving birth to B.G.R, and Deluna testified V.C. is the person who drove the parents from the hospital when they abandoned B.G.R. at the hospital. At the very least, the trial court could have found that V.C. had information about where her son was during the time he and A.C. had been missing and failed to notify the Department.

Finally, B.G.R. is being well cared for in a stable foster family The family has adopted her two half-siblings and wants to adopt B.G.R. as well.

We conclude the trial court could reasonably have formed a firm belief or conviction about the truth of the State's allegation that termination of H.C. III's parental rights is in B.G.R.'s best interest and the evidence is legally and factually sufficient to support that finding.

**Grounds for Termination**

Termination of a parent's rights may be supported by a finding of only one predicate ground. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). H.C. III challenges only the sufficiency of the evidence supporting the trial court's finding under section 161.001(b)(1)(E); he does not challenge the sufficiency of the evidence to support the trial court's findings under section 161.001(b)(1)(N) or (O). He has therefore waived any complaint about the sufficiency of the evidence to support those findings. *In re J.J.S.*, No. 04-17-00747-CV, 2018 WL 1072336, at *2 (Tex. App.—San Antonio Feb. 28, 2018, pet. denied) (mem. op.); *In re C.P.V.Y.*, 315 S.W.3d 260, 269 (Tex. App.—Beaumont 2010, no pet.). Because the evidence supports the trial court's best interest finding and because the trial court's findings on unchallenged predicate grounds support the termination of H.C. III's parental rights, we affirm the trial court's order of termination. *See In re J.J.S.*, 2018 WL 1072336, at *2.

**Endangerment Finding**

A trial court's finding under section 161.001(b)(1)(E) has significant collateral consequences because it provides sufficient basis to terminate parental rights in a later proceeding as to another child. *See* TEX. FAM. CODE § 161.001(b)(1)(M); *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). Therefore, when a parent challenges a trial court's finding under section 161.001(b)(1)(E), due process requires we review the finding, even if another ground is sufficient to support the trial court's order of termination. *N.G.*, 577 S.W.3d at 236-37. We apply the same heightened standard of review to a trial court's finding under section 161.001(b)(1)(E), even when another ground is sufficient for termination. *Id.* at 235.

Section 161.001(b)(1)(E) allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX.

FAM. CODE § 161.001(b)(1)(E). The term "conduct," as used in section 161.001(b)(1)(E), includes both the parent's actions and failures to act. *In re M.J.M.L.*, 31 S.W.3d 347, 351 (Tex. App.—San Antonio 2000, pet. denied). Endangering conduct "may include the parent's actions before the child's birth, while the parent had custody of older children." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding removal of child from parent at birth did not preclude finding parent had engaged in endangering conduct within meaning of (E)).

To "endanger" means to expose the child to loss or injury or to jeopardize a child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "While subsection (E) endangerment must be a direct result of a parental course of conduct, the conduct … does not have to be specifically directed at the child; nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child." *M.J.M.L.*, 31 S.W.3d at 350–51. "Rather, the statute is satisfied by showing that parental conduct simply jeopardized the child's physical or emotional well-being." *Id.* And endangerment can be inferred from the nature of parental misconduct alone. *Boyd*, 727 S.W.2d at 533; *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.).

"As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *J.O.A.*, 283 S.W.3d at 345 n.4 (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)). Thus drug use, knowledge that a child's mother was abusing drugs during pregnancy, and imprisonment of a parent are all factors that may establish an endangering course of conduct. *See id.* (drug use); *Boyd*, 727 S.W.2d at 533 (imprisonment); *In re H.M.J.*, No. 06-18-00009-CV, 2018 WL 3028980, at *5 (Tex. App.—Texarkana June 19, 2018, no pet.) (mem. op.) (failure to attempt to protect child from mother's drug use during pregnancy); *M.J.M.L.*, 31 S.W.3d at 351–52 (knowledge mother abused drugs during pregnancy and abandonment just prior to birth).

In this case, the evidence showed S.R. had illegal drugs in her system when she was admitted to the hospital to give birth to B.G.R.'s older sister, A.C. When A.C. was born and tested positive for drugs, the Department placed her in the care of H.C. III's mother as part of a safety plan. Instead of making efforts to work with the Department to address and resolve S.R.'s drug abuse issues, S.R. and H.C. III removed A.C. from her safety placement and actively hid themselves and A.C. from the Department. At the time of trial, H.C. III had not provided the Department any information regarding A.C.'s whereabouts and demonstrated a complete lack of interest in her physical and emotional well-being, testifying simply, "She's out of my life;" "I have nothing to do with her."

During the year H.C. III was in hiding with S.R. and A.C., S.R. did not stop her drug use, as evidenced by the results of B.G.R.'s meconium drug test. H.C. III did not appear at the hospital to take custody of his newborn, nor did he make any arrangements for B.G.R. to be cared for by a drug-free adult; instead, he abandoned B.G.R. at the hospital. Two months later, H.C. III was arrested on a charge of possession of illegal drugs and sentenced to five years in prison.

We hold the evidence of H.C. III's involvement with illegal drugs, his imprisonment, his conduct with respect to A.C., his role in assisting S.R. to hide from the Department instead of helping her to obtain substance abuse treatment, and his abandonment of B.G.R. is both legally and factually sufficient to support the trial court's finding that H.C. III engaged in conduct that endangered B.G.R.'s physical and emotional well-being. *See H.M.J.*, 2018 WL 3028980, at *5 (holding father's continued drug use and arrest for possession, knowledge mother was pregnant and that her drug use would prevent her from caring for the child, "jeopardized the chances [the child] would be born to a parent who could care for her physical and emotional needs" and was legally and factually sufficient to support finding of endangerment); *M.J.M.L.*, 31 S.W.3d at 351-52 (holding evidence father and drug-addicted mother lived together, their first child had been

born with drugs in his system, father "disappeared" when she was about to give birth to another child without making arrangements for care of his soon-to-be-born son, knowing mother was still using drugs, and after child was removed, father was evasive with Department about his whereabouts and uncooperative was sufficient to support finding against father of endangerment under (E)).  We therefore affirm the trial court's endangerment finding under section 161.001(b)(1)(E).

The trial court's order terminating the parental rights of H.C. III is affirmed.

Luz Elena D. Chapa, Justice