

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00190-CV

———————————————————

IN THE INTEREST OF Z.W., A CHILD

———————————————————

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-104436-17

———————————————————

Before Sudderth, C.J.; Walker and Birdwell, JJ.
Opinion by Justice Walker

## MEMORANDUM OPINION[1]

## I. INTRODUCTION

This is an ultra-accelerated appeal[2] in which K.W. (Father) and H.M. (Mother) appeal the termination of their parental rights to their daughter, Zoe,[3] following a bench trial. In three issues, Father argues that the evidence is legally and factually insufficient to support the trial court's findings under family code sections 161.001(b)(1)(E) (endangering conduct), (b)(1)(L)(viii) (conviction for serious injury to a child under penal code section 22.021—aggravated sexual assault), and (b)(2) (best interest). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E), (L)(viii), (2) (West Supp. 2017). In two issues, Mother argues that the evidence is legally and factually insufficient to support the endangering conduct and best-interest findings. *See id.* § 161.001(b)(1)(E), (2). Because the evidence is legally and factually sufficient to support the trial court's (b)(1)(L) finding and best-interest finding as to both Father and Mother, we will affirm the trial court's judgment terminating Father's and Mother's parental rights to Zoe.

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. R. Jud. Admin. 6.2(a) (requiring appellate court to dispose of appeal from a judgment terminating parental rights, so far as reasonably possible, within 180 days after notice of appeal is filed).

[3]*See* Tex. R. App. P. 9.8(b)(2) (requiring court to use aliases to refer to minors in an appeal from a judgment terminating parental rights). All children are referred to using aliases.

## II. FACTUAL BACKGROUND[4]

## A. Overview

Father and Mother met while they were both on parole for convictions for crimes against children; Father had been convicted of aggravated sexual assault of his stepdaughter Jane, while Mother had been charged with knowingly causing serious bodily injury to her daughter Mary. Mother's rights to Mary were terminated. While Mother and Father were on parole, they conceived Zoe.

Three days after Zoe was born, she was removed from Mother at the hospital due to the risk that Mother's prior offense posed. The Department placed Zoe in foster care because Father's parole conditions prohibited him from having contact with children. The Department offered Father and Mother services, which they mostly completed, but they did not fully address the underlying issues that led to their convictions for crimes against children. Because the trial court determined that Father and Mother remained a danger to Zoe at the time of the termination trial, it terminated their parental rights to Zoe.

---

[4]Because both Father and Mother challenge the sufficiency of the evidence to support the termination order, we set forth a detailed factual background.

### B. Convictions for Crimes Against Children

#### 1. Father

Father first started having deviant thoughts about Jane when she was seven years old after seeing her naked in the shower. Father then spent "quite a while" grooming Jane and peeping in on her. After gaining Jane's trust, Father took advantage of her trust and digitally penetrated her when she was nine years old.

Jane made an outcry to two professionals at school. She said that she had awakened to Father's touching her under her underwear and putting his finger inside of her sexual organ. During her forensic interview and her interview with the CARE Team, Jane provided statements consistent with her outcries.

Father was indicted for continuous sexual abuse of a child but was convicted of the lesser-included offense of aggravated sexual assault of a child under fourteen and was sentenced to five years' confinement.[5] He served three and a half years in the penitentiary and was placed on parole for the remaining one and a half years of his sentence.

#### 2. Mother

In May 2011, Mother was living with her mother who is manic and who had threatened to kick her out if she could not keep eighteen-month-old Mary quiet. On the day in question, Mother had a horrible migraine, for which she refused to take

---

[5]A copy of the judgment reflecting Father's conviction was admitted into evidence during the termination trial.

medication because she was "incredibly stubborn," and Mary had been crying for approximately two hours. Mother was frustrated that Mary would not stop crying. Although Mother's sister was two doors down, Mother did not reach out to her for help. Instead, Mother put her hand over Mary's nose and mouth, causing her to stop breathing and necessitating CPR. Mother pleaded guilty to the offense of injury to a child by recklessly causing serious bodily injury and was sentenced to six years' confinement.[6] She served four years before she was placed on parole.

### C. Father and Mother's Relationship

While Father and Mother were on parole, they met at a halfway house and started a relationship. When Father met Mother, he lied to her about why he was on parole. Father told Mother that he had touched a twelve-year-old girl while he was asleep or that a twelve-year-old girl had "come on to him." In Father's mind, it was easier to say that he had touched a "developing girl" instead of telling the truth—that he had put his finger in his nine-year-old stepdaughter's sexual organ while she was sleeping.

### D. Removal

When Mother gave birth to Zoe in January 2017, the hospital alerted the Department because Mother had disclosed that she had a seven-year-old daughter who had been removed from her care after Mother had tried to suffocate her when

---

[6]A copy of the judgment reflecting Mother's conviction was admitted into evidence during the termination trial.

5

she was eighteen months old. Two days after Zoe was born, the evening nurse reported to the CPS investigator that Zoe was removed from Mother's room after Mother became frustrated with Zoe when she would not stop crying. The evening nurse stated that while this scenario was not uncommon with tired mothers, it was a major concern with Mother due to her prior CPS history.

The Department sought to place Zoe in a parent-child safety placement while Mother worked services. Because Father's conditions of parole prohibited him from being around children and because Mother could not come up with any suitable placements for Zoe, the Department sought temporary managing conservatorship of Zoe and placed her in a foster home.

### E. Trial Testimony

### 1. Father

During the termination trial, Father testified about his conviction, his alcohol abuse, his history of lying, his compliance with his service plan and the tools he had gained, and his plan for keeping Zoe safe if she were placed in his home.

Father admitted that he had sexually assaulted Jane. Father also admitted that Jane had suffered from his sexual abuse, that it had caused her serious harm, and that she would suffer for the rest of her life.

Father said that he had committed the offense against Jane while he was intoxicated. Father later clarified that he did not blame his offense on being

intoxicated. Father continued to consume alcohol after the offense. Father said that he would stop consuming alcohol if Zoe were placed in his home.

Father admitted that he had proven himself to be a liar "time and again." Father testified that while the case was pending, he had become more honest, had faced "the ugly truth" that he was not a good person, and had worked toward becoming a good person. Father said that he had identified the distorted thinking that he had used when he had committed the acts against Jane. He said that he had made the sexual abuse palatable by thinking: "Well, it's okay, she's asleep," or "It's okay, she'll never know about it," or "Nobody's ever going to know." Father also minimized his acts against Jane by thinking that the sexual abuse was not a big deal and that it was not hurting anyone. Father was glad Jane made the outcry when she did because he did not know if he would have stopped.

Father testified that he had completed every item on his service plan except Community Addiction Treatment Services (CATS). Father said that he had stayed off drugs, had maintained employment, and had obtained a home.

Father said that he possessed tools that he did not have when he initially offended. Father said that one of his main tools was monitoring; he and Mother planned to monitor each other to minimize the time that either of them spent alone with Zoe. Father testified that he and Mother were considering purchasing a camera system to monitor their behavior in their home. Father also planned to have other people monitor him because he needed someone to keep him in check from allowing

7

his will to take over, but he had struggled to find positive influences who would associate with him and with Mother due to their past crimes.

Another tool Father had was a safety plan. Father testified that the safety plan he and Mother had drafted required Mother to change Zoe's diaper and to give her a bath. The safety plan also required Father and Mother to remove themselves from the home if either of them felt like they were going to be a danger to Zoe.

Father was aware that Zoe was near the age that Mary was when Mother had attempted to smother Mary. Father testified that Mother committed her offense when she was under considerable stress, so Father was doing his best to provide a comfortable, stable home where Mother could relax. Father said that Mother became stressed and anxious when she did not know what to do in a situation, so he had tried to impress on Mother that there was always a way out.

Father said that if Mother started acting depressed or quiet around him, it would alert him that Mother was at risk for reoffending. Father's plan to keep Zoe safe from Mother was to keep an open line of communication with Mother and to remind Mother that she had people she could reach out to. Father said that if Mother became angry with him, she could tell him she needed five minutes, and he would let her have a smoke break. Father mentioned a paternal uncle as a possible option to

8

look after Zoe if Father and Mother needed some time to figure things out, but Father admitted that he had not spoken with his uncle in over twenty years.[7]

Father opined that Zoe should be placed in his care because he had never done anything to harm her and wanted an opportunity to be a father to her. Father said that if Zoe were placed in his home, she would have a good life, and he would be "a financially good dad." Father said that if he had an inkling that he could not be trusted around Zoe, he would willingly relinquish his right as a parent. But Father admitted that he had not taken any steps to remove himself from Jane even though he had thought about touching Jane for two years before he acted on his thoughts.

Father believed that it was in Zoe's best interest for him to be her father. Father testified that he wanted the trial court to order a gradual reintroduction of Zoe into his home. Father believed that gradual reintroduction would allow Zoe, as well as Mother and Father, the opportunity to adjust to spending more time together. When asked who would keep Zoe if she were placed with Father and Mother, Father hoped that his neighbor would come over and stay with Mother so that she would not be alone with Zoe, but Father had not asked his neighbor to do that. Father said that he and Mother had not identified a daycare center for Zoe and that he did not even know where to begin.

---

[7]At one point, Father presented one of his friends as an option who could help Mother watch Zoe, but the friend had two DWIs.

Father admitted that his past would create stress for Zoe because she would not be allowed to be alone with either one of her parents, she might have video cameras in her home to monitor Father's and Mother's behavior, and her friends would have to be informed of Father's criminal history before spending the night. Father agreed that Zoe deserved "better than that," and he believed that by continuing to work on himself, he could create "better than that." Father requested that the trial court place Zoe with Mother if it found that Father's prior sexual assault conviction made it risky to place Zoe with him. Father said that he would move out of the home that he and Mother had shared for a year and that he would not see Zoe anymore.

## 2. Mother

Mother testified that Zoe was removed "[d]ue to risk from our past," which included her smothering her daughter Mary until she turned blue and required CPR and Father's conviction for aggravated sexual assault of his stepdaughter. Mother testified that she had learned that she could only control herself and that losing control of herself for even ten minutes could affect many lives for an indefinite period of time.

Mother testified that Father's risk factors for reoffending included drinking alcohol excessively, using drugs of any kind, encountering complications in his relationship with Mother, feeling unhappy in his job or in life, and losing communication from his support network. Mother's plan for preventing Father from

10

sexually abusing Zoe included being observant; not allowing him to be alone with Zoe; establishing a no-boys-in-the-bathroom rule after Zoe becomes old enough to bathe by herself; and teaching her the correct names of body parts so that she could make an outcry, if necessary. Mother testified that she and Zoe would leave if Father became a threat to Zoe. Mother also planned for Father to continue to attend group therapy at PSY Family Services (PSY) so that he would have access to someone who could help him with his prior conviction.

Mother believed that she and Father should have limited "alone time" with Zoe. Mother said that as long as she was not frustrated and was not "having any issues," she could be alone with Zoe for an indefinite period of time. Mother testified that she would remove herself from the home if she were frustrated.

With regard to her service plan, Mother testified that she and Father had not finished couples counseling due to scheduling issues related to Father's job. Mother also said that she had been without a job since "before Easter."[8]

Mother testified that it was not in Zoe's best interest for Mother's parental rights to be terminated. Mother acknowledged that risk was involved in placing Zoe with her and Father, but she said, "[W]e've done everything we can to show that we

---

[8]Easter was on April 1, 2018. *See* Tex. R. Evid. 201(b); *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 623 (Tex. 2012) (stating that appellate court may take judicial notice of a relevant fact that is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"). The termination trial took place on May 15, 2018.

11

have bettered ourselves and to make a good life for our daughter." Mother requested that the trial court order a monitored return of Zoe. Mother testified that a monitored return would be the best option because CPS would still be involved in their lives, which would provide Father and Mother with a support system and would allow the Department to see how Zoe was doing in Father and Mother's care. But Mother said that she and Father were in agreement that it was more important for Zoe to be placed with either her or Father than neither of them.

### 3. Therapist

Norma Bartholomew, who is a therapist in private practice, met with Father and Mother for individual and couples counseling. Bartholomew testified regarding the goals of Father's and Mother's counseling, the progress they made, and her recommendation regarding whether Zoe should be placed with Father and Mother.

One of the goals for Father's individual counseling was to develop strategies to make sure that he was correctly dealing with the issues that would prevent him from being unsafe around children in the future. Bartholomew testified that as a result of her sessions with Father, she believed that he had become more honest about his sexual offense with Jane, that he had engaged in exploring some of his behavioral characteristics and personality traits that caused him to be defensive, that he was able to move away from taking the stance of being the victim, and that he had taken a more levelheaded look at what he would deal with going forward as a registered sex offender. Bartholomew believed that Father had an understanding of his risk factors.

12

Bartholomew opined that Father had made some progress from where he had started with her to where he had ended with her.

The primary goal for Mother's counseling included reviewing parenting and child safety issues as identified by the Department related to the case; talking about parenting challenges and parenting stressors; showing an awareness of stressors that had been involved in her injury-to-a-child case; looking at strategies for coping with the stressors; looking at managing emotional triggers and at managing anger; focusing on basic education about trauma in child sexual abuse cases, including impacts on victims and characteristics of perpetrators; and participating in couples counseling. Bartholomew testified that Mother's attendance varied due to her transportation issues and her work schedule. Due to Mother's absences, they did not develop a safety plan to mitigate the danger Mother posed to Zoe.

Bartholomew testified that Mother was reluctant to delve too deeply into the details of the offense she had committed. Bartholomew said that it would provide an extra layer of safety if they were able to look at "all of the antecedents" of the offense. But because Mother was unwilling to discuss the triggers that had led to her offense, Bartholomew was concerned about Zoe's being returned to Mother while she was near the same age as Mary was when Mother attempted to smother Mary. Bartholomew recommended that Mother continue counseling to explore her stressors.

Bartholomew testified that it concerned her that Mother thought that Father's victim had contributed to the sexual abuse by Father that she had endured. Bartholomew informed Mother in general about how victims are impacted by abuse, explaining that the effects of sexual abuse on a child constitute a serious injury and that there is psychological and long-lasting emotional damage to the victim. During one of Mother's last individual counseling sessions, she expressed resistance to having Father continue his participation in the sex offender relapse group and Alcoholics Anonymous because she did not think it was fair that Father would have to continue attending these groups.

Bartholomew opined that Mother had reached approximately fifty percent of the goals for her individual counseling. When asked whether Mother had a better understanding of what had triggered her to injure Mary, Bartholomew responded, "I would say not 100 percent."

During the couples counseling sessions, Father wrote out the details of his crime on a whiteboard. Based on Father's explanation of his crime, Bartholomew opined that Mother understood what the concerns were and what crime Father had committed. During the last couples counseling session, Father had said that he thought it was a good idea for him to continue participating at least monthly in sex-

offender group therapy at PSY to prevent relapse, but he did not perceive that he needed to attend a support group for alcohol or drug avoidance.[9]

Bartholomew worked with Father and Mother to develop a safety plan to address mitigating Father's danger to Zoe. The safety plan required the couple to jointly supervise Zoe and to teach her about boundaries and privacy as she grows and learns to talk. The safety plan also required Mother to give Zoe baths.

Bartholomew noted that Father and Mother had struggled with the stress of handling basic day-to-day family management regarding their jobs and transportation, which made Bartholomew concerned about what would happen if Zoe were placed in their care amid the ongoing family management stressors. Bartholomew explained that based on Father's and Mother's irregular attendance at their counseling sessions, it appeared to Bartholomew that there was "a lot of chaos in their lives" and that "in terms of financial management, transportation management, illnesses, things like that that kind of create a general sense that -- that things were not quite a hundred percent stable in the family management . . . department." Bartholomew further explained that such chaos was not uncommon for couples whose household income is at or near the poverty level but that adding a child into the home brings "yet another layer of stress."

---

[9]Bartholomew testified that drugs were a factor in Father's "original offense."

With regard to whether Bartholomew felt comfortable recommending that the trial court place Zoe with Father and Mother, Bartholomew testified that she thought Father and Mother would need "a lot of support" if that were to happen and that there should be "some indication" that Father had followed through with his plan to voluntarily stay in touch with the relapse group at PSY. Bartholomew opined that it would "probably be very good for everyone involved" if the trial court continued to monitor the situation and if Father and Mother continued couples counseling. Bartholomew also testified that day care "would be a necessary thing" because it would provide an extra set of eyes and because of the chaos in Father's and Mother's lives. When asked whether Father and Mother should be given the opportunity to parent Zoe, Bartholomew deferred to the trial court, stating, "If that's what the Court feels is appropriate." When asked the question a second time, Bartholomew again deferred to the trial court and added that her caveat would be that Father and Mother "need a lot of support going forward."

### 4. Sex Offender Counselor

Steven Woodward, who had previously worked at PSY as a psychotherapist and led group therapy for sex offenders, testified that Father was assigned to one of the sex offender groups he led. Father began attending the sex offender group in 2015 when he was on parole.

Woodward expressed concerns about how the relationship between Father and Mother began. Woodward explained that Father had started his relationship with

16

Mother without being honest. Woodward said that Father's actions raised a serious concern about whether he was willing to use the tools that he had been given during his group therapy sessions.

During the group sessions at PSY, Woodward worked with Father on dealing with the deviant arousal component of his offense. Woodward also worked with Father on identifying his distorted thinking patterns. After Woodward left his employment at PSY, he learned that Father had not maintained regular contact with PSY, which concerned Woodward. Woodward said it was best if clients attended groups weekly until significant progress was made.

Woodward testified that he would have concerns about placing Zoe in Father's home. Woodward opined that Father lacked the insight to recognize when he might be lapsing into another thought cycle like the one prior to his offense, which could put Zoe in danger. Woodward testified that if Father had regularly attended and participated in treatment with PSY, he would have had more of an opportunity to gain insight and move forward in a way that would allow him to be an appropriate parent for Zoe.

### 5. Conservatorship Worker

Monique Barnes, the conservatorship worker assigned to Zoe's case, testified that Zoe had lived in three foster homes: the first foster home was not adoption motivated, the second foster home asked to be discharged for personal reasons, and

17

so the Department moved Zoe to a new adoption-motivated foster home during the month of the termination trial.

Barnes testified that Father and Mother have an appropriate home that is clean and free of hazards. But Barnes was unsure whether Father and Mother could financially support Zoe because they had not turned in paystubs.

Barnes testified that Zoe is bonded to Father and Mother and that Father and Mother are bonded to Zoe. Barnes had no doubt that Father and Mother love Zoe. Barnes had observed Father and Mother during visits with Zoe, and they were supportive of each other during the visits. When asked whether the parents' visits were always appropriate, Barnes said, "Give or take, yes." Barnes said that Father and Mother had worked with a parenting coach who had helped them with their visits.

Barnes testified that despite the bonding between Zoe and her parents, the Department did not recommend reunification. With regard to why Zoe should not be reunited with Mother, Barnes explained that she had asked Mother the week before the termination trial whom she would choose as between Father and Zoe and that Mother had said she did not know. Barnes further explained that Mother did not understand the risks of Father's alcohol consumption, despite that he had listed intoxication as one of the reasons why he had committed his offense against Jane. Barnes testified that Mother had no job and that unemployment had played a role in her offense against Mary. Moreover, Barnes said that Mother had not been willing to discuss what had happened with Mary.

18

With regard to why Zoe should not be reunited with Father, Barnes testified that Father was still consuming alcohol, despite the role it had played in his offense against Jane, and that he had not undergone treatment at CATS. Additionally, Barnes was concerned about Father's thinking because he had rationalized that he would not sexually assault Zoe because she was his biological daughter, not his stepdaughter; Father's rationalization ignored the fact that his offense was not based on whether he was related to the victim but rather on the victim's vulnerable age.

Barnes opined that the Department had given Father and Mother ample tools to utilize to be reunified with Zoe but that they had not taken full advantage of the services they had been offered. Barnes testified that Father and Mother had not gained the insight that they were intended to gain from counseling.

Barnes opined that it was therefore in Zoe's best interest for Father's and Mother's parental rights to be terminated. The Department requested that the trial court terminate Father's and Mother's parental rights to Zoe so that she could be placed for adoption with her then-current foster parents or with a family placement.[10]

---

[10]Barnes testified that the Department had discovered possible family placement options that Father and Mother had not mentioned—Father's uncle and his wife and a maternal relative. Barnes said that Father's uncle and his wife were willing to be a placement option for Zoe and that the Department was going to focus on them.

19

### 6. Zoe's Ad Litem

During closing arguments, the ad litem stated, "I feel like [Father and Mother] didn't take advantage of the opportunities until very recently. I feel like they've made growth, but it's just too little, too late. I don't think that they've mitigated the circumstances that will put [Zoe] in danger."

### 7. Outcome

After hearing the above testimony and reviewing the evidence admitted at trial, the trial court found by clear and convincing evidence that both Father and Mother had violated subsections (E) and (L) of section 161.001(b)(1) and that termination of their parental rights was in Zoe's best interest. Father and Mother each perfected an appeal from the trial court's termination order.

### III. BURDEN OF PROOF AND STANDARDS OF REVIEW

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2014); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor

20

of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), 161.206(a); *E.N.C.*, 384 S.W.3d at 802. Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the Department must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm

21

belief or conviction that the Department proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses because that is the factfinder's province. *Id.* at 573–74. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated one of the provisions of section 161.001(b)(1) and that termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann.

22

§ 161.001(b)(1), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## IV. SECTION 161.001(B)(1) GROUND

### A. Father's Challenge to (b)(1) Grounds

In his second issue, Father argues that the evidence is legally and factually insufficient to support the trial court's section 161.001(b)(1)(L) finding. Father states in his brief that it is undisputed that he was convicted of the offense of aggravated sexual assault of a child under fourteen years of age but argues that the State offered no evidence to show that Jane suffered serious injury as a result of his conduct.

Under subsection (L), termination is permissible only if (1) the parent has committed acts constituting a violation of one of the statutorily-enumerated crimes listed in subsection (L); (2) the parent's guilt for committing the crime has been adjudicated or the adjudication of that guilt has been deferred; and (3) the parent, in committing the acts that underlie the crime, was responsible for a child's death or serious injury. *In re A.R.R.*, 61 S.W.3d 691, 699 (Tex. App.—Fort Worth 2001, pet. denied), *disapproved on other grounds by In re A.V.*, 113 S.W.3d 355 (Tex. 2003). Father challenges only the third element—whether he, in committing the acts underlying the aggravated sexual assault, was responsible for causing serious injury to Jane.

23

The family code does not define "serious injury," so we give it its ordinary meaning. *See* Tex. Gov't Code Ann. § 312.002 (West 2013); *In re A.L.*, 389 S.W.3d 896, 900–01 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "Serious" means "having important or dangerous possible consequences," while "injury" means "hurt, damage, or loss sustained." *A.L.*, 389 S.W.3d at 901. Demonstrating "serious injury" to a child under subsection (L) does not require a showing of "serious bodily injury" as defined in the penal code. *Id.* Moreover, the Texas Supreme Court disavowed the suggestion that molestation or indecency with a child generally does not cause serious injury, thus intimating that psychological or emotional injuries are relevant when determining whether a child has sustained "serious injury" for purposes of subsection (L). *See In re L.S.R.*, 92 S.W.3d 529, 530 (Tex. 2002).

During his testimony, Father admitted that Jane had suffered from his sexual abuse, that it had caused her serious psychological harm, and that she would suffer that harm for the rest of her life. Bartholomew testified that the effects of sexual abuse on a child constitute a serious injury. Bartholomew further testified that sexual abuse causes psychological and long-lasting emotional damage to the victim. Barnes also agreed that, based on the information she had reviewed in the CPS file, Father's offense against Jane had caused her serious injury.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence on which a reasonable

24

factfinder could have formed a firm belief or conviction that Father, in committing the acts underlying the aggravated sexual assault, was responsible for causing serious injury to Jane. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(L)(iv); *In re F.G.M.*, No. 10-14-00066-CV, 2014 WL 6872890, at *2 (Tex. App.—Waco Nov. 26, 2014, no pet.) (mem. op.) (holding evidence legally sufficient to support serious-injury element of subsection (L) based on mother's testimony that daughter had suffered "physical trauma" and "emotional and psychological harm" from indecency, that she was emotionally unstable, and that she had suffered from a lifelong inability to form relationships); *A.R.R.*, 61 S.W.3d at 700 (holding evidence sufficient to support trial court's subsection (L) finding and stating that there was uncontroverted evidence of third element based on caseworker's testimony that sexual abuse caused child to sustain serious injury to her emotional well-being and that such injury could present a "lifelong problem").

Giving due deference to the factfinder's subsection (L) finding, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a reasonable factfinder could reasonably form a firm conviction or belief that Father, in committing the acts underlying the aggravated sexual assault, was responsible for causing serious injury to Jane. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(L)(iv); *A.R.R.*, 61 S.W.3d at 700.

Accordingly, we overrule Father's second issue.[11]

## B. Mother's Challenge to (b)(1) Grounds

In her first issue, Mother argues that the evidence is legally and factually insufficient to support the trial court's section 161.001(b)(1)(E) finding. Mother stipulates in her brief that "at least one ground, namely Texas Family Code provision 161.001(b)(1)(L) existed for the termination." Because the record contains sufficient evidence to support Mother's concession regarding the trial court's subsection (L) finding—that she had been convicted for being criminally responsible for the death or serious injury of a child under one of the statutorily-enumerated crimes listed in subsection (L)—and because only one finding under (b)(1) is necessary for a judgment of termination, we overrule Mother's first issue. *See In re C.P.V.Y.*, 315 S.W.3d 260, 269 (Tex. App.—Beaumont 2010, no pet.) (holding unchallenged finding under one subsection sufficient to support termination judgment).

## V. SECTION 161.001(B)(2) GROUND

In Father's third issue and in Mother's second issue, they each argue that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

---

[11]Because, along with a best-interest finding, a finding of only one ground alleged under section 161.001(b)(1) is necessary to support a judgment of termination, we need not address Father's first issue challenging the trial court's section 161.001(b)(1)(E) finding. *See* Tex. R. App. P. 47.1; *see also In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); *In re S.B.*, 207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

## A. Best-Interest Factors

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence may be probative of both the subsection (1) ground and best interest. *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include the following: (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors"); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the

27

best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B. Best-Interest Analysis[12]

Zoe was too young to testify at trial, so there is no evidence in the record about her desires regarding placement. The record contains evidence that Zoe was bonded to Father and Mother and that they were bonded to her. Because Zoe had recently been moved to a new foster home at the time of the termination trial, not enough time had elapsed for Zoe to bond with her new foster parents. The trial court was entitled to find that this factor weighed against terminating Father's and Mother's parental rights to Zoe.

With regard to Zoe's emotional and physical needs now and in the future, the record reflects that her basic needs include food, shelter, and clothing; routine medical and dental care; a safe, stimulating, and nurturing home environment; and friendships and recreational activities appropriate to her age. Zoe also requires allergy medication to treat her allergies. The record demonstrates that finances—which are required to provide Zoe with food, shelter, clothing, and medication—had been a stressor for Father and Mother even without Zoe's living with them. Although Father believed that he could provide for Zoe's needs, he had not presented the conservatorship

---

[12]Because conducting a best-interest analysis for Father and a separate best-interest for Mother would result in repetitively restating the evidence, we conduct a single, consolidated best-interest analysis.

worker with any paystubs, and Mother was unemployed at the time of the termination trial. The ability of Father and Mother to provide a safe home for Zoe that is free of physical and sexual abuse remained in question due to their prior offenses, and Father admitted that his conviction would be a stressor for Zoe throughout her life because of the stigma of having a father who is a sex offender. The trial court was entitled to find that this factor weighed in favor of terminating Father's and Mother's parental rights to Zoe.

With regard to the emotional and physical danger to Zoe now and in the future, at the time of trial, Zoe was seventeen months old—close to the age of Mary when Mother attempted to suffocate her and not yet past the age of seven, which was Jane's age when Father began having deviant thoughts about her and started grooming her. The Department and Zoe's ad litem expressed concern over Father's and Mother's failure to fully address the underlying issues that led to their convictions for crimes against children, which created an ongoing emotional and physical danger for Zoe. Father's group leader for sex-offender therapy also expressed concern about placing Zoe in Father's home because Father lacked insight to know when he might be lapsing into a thought cycle that could put Zoe at risk. The trial court was entitled to find that this factor weighed in favor of terminating Father's and Mother's parental rights to Zoe.

With regard to Father's and Mother's parental abilities, they demonstrated that they were able to interact well with Zoe during supervised visits where they had the

29

help of a parenting coach. But Father continued to drink alcohol, despite the role it had played in his offense against Jane, and had suggested that someone who had two DWIs could help Mother watch Zoe. Additionally, shortly before trial, Mother expressed an inability to choose between Father and Zoe, which did not bode well for her ability to remove Zoe if Father exhibited risk factors indicating he would reoffend, and Mother had previously chosen her own comfort over her child's when she had attempted to smother Mary when she was crying. Moreover, the risk posed by Father's and Mother's convictions for crimes against children could not be diminished without round-the-clock outside supervision, which was not feasible. The trial court was entitled to find that this factor weighed in favor of terminating Father's and Mother's parental rights to Zoe.

With regard to the programs available to assist Father and Mother to promote Zoe's best interest, the record demonstrates that Father and Mother worked most of their services but did not fully address the underlying issues that led to their offenses. Father refused to stop drinking alcohol and to attend CATS even though alcohol had played a role in his conviction, Mother was unemployed and did not fully meet her individual counseling goals, and they did not complete couples counseling. The trial court was entitled to find that this factor weighed in favor of terminating Father's and Mother's parental rights to Zoe.

With regard to Father's plans for Zoe, his service plan states that his hopes and dreams for Zoe are that she will grow up to be a happy child, that she will have a

normal life, that she will go to college, and that she will experience stability. Mother's service plan states that her hopes and dreams for Zoe are that she will be raised with security and love; that she will be happy and healthy and have a Christian upbringing; and that she will be raised by Father and Mother. The Department planned for Zoe to be adopted but had not selected an adoptive family for Zoe due to her recent move to a new foster home. This factor weighs neither for nor against terminating Father's and Mother's parental rights to Zoe.

With regard to the stability of Father's and Mother's home, they had secured suitable housing. The stability of the proposed placement, however, was unknown because Zoe had been moved to a new foster home shortly before the termination trial, and the Department was investigating whether it was in Zoe's best interest to be adopted by her new foster parents or by a newly-identified relative placement. The trial court was entitled to find that this factor weighed against terminating Father's and Mother's parental rights to Zoe.

With regard to any excuse for Father's acts, he indicated that alcohol had played a role in his conviction for sexually assaulting his nine-year-old stepdaughter. With regard to any excuse for Mother's acts, she blamed her conviction for recklessly causing bodily injury to her eighteen-month-old daughter on a migraine that she had refused to treat with medication. The trial court was entitled to find that this factor weighed in favor of terminating Father's and Mother's parental rights to Zoe.

After reviewing the entire record, we conclude that Father and Mother have made numerous positive changes in their lives. However, in conducting a legal and factual sufficiency review of the evidence to support the trial court's best-interest finding, our focus is on whether the Department presented clear and convincing evidence supporting the (b)(2) best-interest ground, not on the relative equities as they pertain to the parents' betterment of themselves. We must also give due deference to the factfinder's credibility determinations and not supplant them with our own. *H.R.M.*, 209 S.W.3d at 108. After reviewing all the evidence, applying the appropriate standards of review, and deferring to the factfinder's credibility determinations, we hold that the trial court could have reasonably formed a firm conviction or belief that termination of the parent-child relationship between Father and Zoe and between Mother and Zoe was in Zoe's best interest. We therefore hold the evidence legally and factually sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *Jordan v. Dossey*, 325 S.W.3d 700, 733 (Tex. App.— Houston [1st Dist.] 2010, pet. denied) (holding evidence legally and factually sufficient to support the trial court's best-interest finding when most of the best-interest factors weighed in favor of termination); *In re I.W.*, No. 14-15-00910-CV, 2016 WL 1533972, at *6 (Tex. App.—Houston [14th Dist.] Apr. 14, 2016, no pet.) (mem. op.) (holding evidence legally and factually sufficient to support trial court's best-interest finding because father had pleaded guilty to sexual contact with child and had refused to deal

32

with substance-abuse issues). Accordingly, we overrule Father's third issue and Mother's second issue.

## VI. CONCLUSION

Having overruled Father's second and third issues, which are dispositive of his appeal, we affirm the trial court's judgment terminating his parental rights to Zoe. Having overruled Mother's two issues, we affirm the trial court's judgment terminating her parental rights to Zoe.

/s/ Sue Walker
Sue Walker
Justice

DELIVERED:  September 13, 2018