**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00218-CV**
_____

**IN THE INTEREST OF N.P.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 19-05-07070-CV**

**MEMORANDUM OPINION**

T.V. ("Mother") appeals the trial court's order terminating her parental rights

to her minor daughter, N.P., based on Texas Family Code subsections

161.001(b)(1)(D), (E), (N), and (O) and a finding that termination was in N.P.'s best

interest.[1,2] *See* Tex. Family Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). In two

issues, Mother challenges the legal and factual sufficiency of the evidence

---

[1] In parental rights termination cases, to protect the identity of the minors, we refer to the children by a pseudonym or initials and family members by their relationships to the children. *See* Tex. R. App. P. 9.8(b)(2).

[2] Father signed an affidavit of voluntary relinquishment, and the trial court terminated his rights in the same proceeding. Father is not a party to this appeal.

1

supporting only predicate grounds D and E.[3] We affirm the trial court's judgment terminating Mother's parental rights.

## Background

On May 22, 2019, the Department of Family and Protective Services ("Department") filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming N.P. as the subject of the suit. The Department supported the petition with an affidavit of a Child Protective Services (CPS) worker. The intake allegations in the affidavit were that the Department received a report that N.P. went to the clinic with a black eye and stated that her caregiver hit her. The affidavit alleged that the caseworker spoke with N.P. as well as the two aunts and a cousin with whom she resided, who "all have special needs." They lived with N.P.'s maternal grandmother, who was their primary caretaker until she passed away in February 2018. The affidavit further averred there was no legal documentation that showed N.P. was under the care of any adult who could make legal, medical,

---

[3] Mother does not challenge the trial court's findings as to subsections N and O, nor does she challenge the trial court's finding that termination of her parental rights was in the child's best interest. Because Mother does not challenge predicate grounds N and O or the trial court's best interest finding, she has waived any complaint about the sufficiency of the evidence to support those findings. *See In re C.P.V.Y.*, 315 S.W.3d 260, 269 (Tex. App.—Beaumont 2010, no pet.); *see also In re B.G.R.*, No. 04-19-00614-CV, 2020 WL 1015820, at *5 (Tex. App.—San Antonio Mar. 3, 2020, no pet.) (mem. op.).

financial, or educational decisions for the child and outlined the Department's attempts to contact the parents. The affidavit outlined N.P.'s speech difficulty and noted a bruise by her eye, which was how the Department became involved; the caseworker also noted that "[N.P.] appeared to be a happy little girl by the evidence of her laughing and playing with her toy, interacting with her aunt and cousin very well." N.P. showed the caseworker where she injured her eye by pointing to a corner in the kitchen and told her she had fallen while getting her chips.

One of the aunts stated she did not work but gets food stamps and Medicaid and appeared to have a developmental delay; this aunt reported that she was at a store when N.P. fell, but the other aunt said that N.P. hit her eye on the corner in the kitchen trying to get something out of the cabinet. The affidavit stated that one of the aunts reported Mother does not live with them because she was on drugs, and they have had N.P. since she was a baby. The affidavit explained that the family had moved in with a family friend, M.V., since N.P.'s grandmother passed away, because their living conditions "were horrible." M.V. was out of town for work when N.P. fell but said that the aunts would never hurt N.P. M.V. reported that she had power of attorney for N.P., but it was only while N.P. was at school.

The affidavit noted that the disposition for the original intake was "ruled out" and that

> [t]here is not a preponderance of evidence that supports [the aunts] failed to provide the children with food, clothing, or shelter necessary

3

to sustain the life or health. The home had running water, electricity, and food. The home conditions do not pose a health and safety threat to the children. . . . The home was clean and no safety hazards were observed. Due to the availability of information, the allegations will receive a ruled out disposition.

However, the affidavit's "conclusion" was as follows:

"[N.P.] is 5 years old and vulnerable due to her age with special needs. Her parents are unable to take care of her, and the Department is concerned about the level of care that she will be able to receive with the current caregivers with intellectual disabilities and no court orders regarding who can make any medical, educational, or future financial decisions for this child. For these reasons the Department [] is petitioning to be named the Temporary Managing Conservator of [N.P.]"

On May 30, 2019, following the initial show cause hearing, the trial court entered orders appointing the Department as N.P.'s temporary managing conservator.[4]

**Trial Evidence**

**Testimony of Jeff Sermons**

Jeff Sermons, the Department conservatorship caseworker testified that N.P. came into the Department's care after she was sent to live with her aunts who also lived with developmental delay disabilities, and there was a concern they could not

---

[4] The final hearing did not take place until August 12, 2020; however, the trial court entered an order granting an extension finding "that extraordinary circumstances necessitate that the child the subject of this suit remain[] in the temporary managing conservatorship of [the Department], and that continuing the appointment of the Department as temporary managing conservator is in the best interest of the child." *See* Tex. Fam. Code Ann. § 263.401. The trial commenced within 180 days of this extension per the statute. *See id.*

appropriately care for N.P. Mother did not leave any type of documentation where they could tend to N.P.'s medical or educational needs, and Mother "was missing in action" at that point and believed to be homeless and addicted to illegal drugs. Sermons testified that N.P was "very delayed[]" and had speech issues. She was healthy, but her teeth were in bad shape and she required "a lot of dental work." She loved her aunts, but they could not care for her appropriately. Sermons testified that the Department's finding for Mother was "[r]eason to believe for neglectful supervision."

Mother "show[ed] up" approximately six months into the case, about the time Sermons began handling the case. Sermons testified that Mother had not seen N.P. since he had been assigned the case, which had been at least eight months, and the records do not indicate that Mother had any contact with N.P. after June 2019. Sermons testified that he met with Mother several times and that she advised him that "she's been homeless, that she's in transit[]" and "her stability was just not there." On more than one occasion, Mother told Sermons she was unable to care for N.P.

Sermons confirmed that Mother tested positive for amphetamines in January of 2020 and had a baby after that who tested positive for amphetamines.[5] Sermons

---

[5] The drug test results admitted at trial showed that Mother tested positive for amphetamines and methamphetamines.

testified that the other baby, born in May, remained in the hospital at the time of trial, and was born prematurely at twenty-six weeks. Sermons explained that he discussed the new baby with Mother, and she advised that her plan was relinquishment. Sermons expressed concerns about Mother's ongoing drug use and demonstrated inability to care for N.P. due to her drug use and homelessness.

Sermons testified they visited with Mother about possible placements, and there were no appropriate family members. N.P. was in foster care during the pendency of the case, and Sermons testified that the Department had recently "found a forever family for [N.P.]" He explained that N.P. met with the potential adoptive parents, and it went "really, really well." Sermons testified that he felt that this would likely be her forever family who would adopt her, and they understand her special needs. Sermons confirmed that N.P.'s dental problems had been resolved, but her medical issues are ongoing due to the chromosomal abnormalities.

Sermons explained that they developed a service plan for Mother, he went over it with her in January, and she appeared to understand it. Sermons testified that Mother was aware her rights could be subject to termination. Sermons testified that Mother did not complete anything in the service plan other than to take one drug test. Sermons testified that he attempted to send her for additional drug tests after January, but the phone numbers he had for her were either not working or had been disconnected, and his contact with her was "very, very sporadic." Sermons testified

that he last had contact with Mother a month before trial, and at that time, she had not taken any parenting classes, obtained housing, had a substance abuse assessment, or attended counseling. Sermons indicated he told Mother she could set up visits and that she could have visited with N.P., but she chose not to do that.

Sermons opined that Mother is not able to care for N.P., and he believed it was in N.P.'s best interest for both parents' rights to be terminated. Sermons agreed it would significantly impair N.P.'s physical or emotional welfare if either parent had custody of her. He based his opinion on Mother's past history of abandonment, homelessness, and illegal drug use plus the fact that Mother had not had any significant contact with N.P. for more than one year at the time of trial.

Sermons described the efforts the Department took to find a family placement for N.P. Sermons explained the foster family they chose was "a really good fit[,]" because they provided structure, appropriate redirection, and they understood N.P.'s needs may extend into adulthood and were prepared to deal with that possibility. Sermons testified that N.P. has a chromosomal condition – 7P chromosome deletion and what some of her issues were associated with that, including slight facial deformities that affected her speech. Sermons explained that people tend to underestimate N.P., but she is "very bright." Sermons explained that the adoptive family already had several visits, scheduled their overnight visit, and they planned to place N.P. with the family shortly after the trial. Sermons indicated that N.P.'s

7

potential adoptive parents are "open[]" to the idea of taking N.P.'s infant sibling as well but want to get N.P. adjusted first.

**Testimony of Elizabeth Chapman**

Elizabeth Chapman, the assigned CASA representative for N.P., testified at trial. She described N.P. as "very lively[]" and that she has "little breakthroughs of intelligence where you think she's smarter than she's appearing to be." Chapman testified that the foster mother has done a good job meeting N.P.'s many needs – medical, dental, psychological, and chromosome testing, none of which had been addressed before she was in CPS custody. With the new diagnosis, they know how to help her and can move forward. Chapman testified that N.P. is in special education classes, receives speech therapy, special attention, and is improving.

Chapman said she only met Mother once, in the hallway of the courthouse "when she showed up." Chapman testified they talked about Mother's plans, and she had "no concrete plan." According to Chapman, Mother seemed concerned about N.P. Chapman described her discussion with Mother as "more that she didn't have a home[;] [s]he was aware she was on drugs and needed some place to go." Chapman explained that "[Mother] didn't say she was actively using drugs. She said she had to go somewhere to get over it."

Chapman had been associated with N.P.'s case since the outset in May 2019, and Mother never made any attempts to visit. Chapman indicated Mother never

8

provided any kind of financial or other support for N.P. Chapman testified that Mother did not complete any services on her family service plan. Chapman was aware of Mother's lack of means but was critical of Mother in refusing help from the Department and failing to make much effort to visit with N.P. or accomplish the steps necessary in her family plan to be reunified with N.P. Chapman confirmed that Sermons and the Department offered help, transportation, and other services, which Mother refused to accept, and she believed that CPS did everything they could to help Mother. It was Chapman's opinion that Mother completely abandoned N.P. for the year prior to trial.

Chapman confirmed she worked through potential family placements and was involved in the process of selecting N.P.'s forever family. She agreed with Sermons that the potential adoptive family is N.P.'s best option, because they "seem to be very able to help her in many ways." Chapman testified that the prospective family "was stellar . . . I think it was instantly a good fit[]" and felt it would be a good plan going forward. Chapman said she did not have any concerns about the adoptive family.

She felt termination would be in N.P.'s best interest, because she would have "more of an assured future[]" and neither parent had "any means of working their schedules or getting an appropriate home for her or . . . way to create a permanent

home. It was just nothing." She felt it was in N.P.'s best interest to be placed with the potential adoptive family.

**Other Evidence**

Additional evidence admitted at trial without objection included the service plan, Mother's drug test results showing a January 2020 positive drug test for methamphetamines, and status hearing order incorporating the service plan. Mother did not appear in person at the hearing, but her attorney made a statement on the record describing how she notified Mother of the proceedings and confirmed Mother's awareness of them.

**Trial Court's Findings**

The trial court found by clear and convincing evidence that termination of the parent-child relationship between Mother and N.P. was in N.P.'s best interest and that the Department established the grounds for termination by clear and convincing evidence of subsections D, E, N, and O. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). Those predicate grounds included that Mother knowingly allowed the child to remain in conditions that endangered her physical and emotional well-being, engaged in conduct, or knowingly left the child with persons who engaged in conduct that endangered her physical emotional well-being, constructively abandoned the child, and failed to follow a court-ordered service plan. *See id.*

10

**Standard of Review**

The standard of proof required in cases involving termination of parental rights is clear and convincing evidence. *See id.* § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

When conducting a legal sufficiency review of the termination of parental rights,

> a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802.

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a

factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We defer to the factfinder's findings, and we cannot substitute our judgment for the factfinder's. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of assessing the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

Only one predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interests. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute). Here, Mother does not contest the predicate findings for termination under N or O. Accordingly, we can affirm the termination on those grounds alone. *See In re C.M.C.*, 554 S.W.3d 164, 169 (Tex. App.—Beaumont 2018, no pet.). However, Mother challenges the endangerment findings, and given the potential future consequences of a finding under subsections D or E for a parent of a different child, due process concerns and the requirement for a meaningful appeal mandate an analysis of these grounds. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam); *In re C.M.C.*, 554 S.W.3d at 169; *see also* Tex. Fam. Code Ann.

12

§ 161.001(b)(1)(M) (providing a sufficient basis to terminate parental rights based on a previous section 161.001(b)(1)(D) or (E) finding).

**Analysis**

In two issues, Mother challenges the sufficiency of the evidence to support termination under subsections D and E. Subsection D allows for the termination of parental rights if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection E, parental rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). The Texas Supreme Court has explained that "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). To endanger a child, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* (citations omitted). Because evidence of grounds D and E is often interrelated, we may consolidate our review of the evidence supporting these grounds. *In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.).

13

"Subsection D requires the endangerment to the child to be the direct result of the child's environment." *See In re J.H.*, No. 09-20-00056-CV, 2020 WL 4516860, at *10 (Tex. App.—Beaumont Aug. 6, 2020, no. pet) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at *5 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection D endangerment analysis. *See In re J.L.V.*, 2020 WL 1161098, at *10. Under subsection D, termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See J.H.*, 2020 WL 4516860, at *10 (citations omitted).

Termination under subsection E necessitates more than a single act or omission, rather the evidence must "show a conscious course of conduct." *In re C.M.C.*, 554 S.W.3d at 172 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). In our analysis of subsection E, we may consider actions

14

occurring before and after a child's birth to establish a "course of conduct." *See id.* (citation omitted).

Evidence of a parent's drug use can support the conclusion that the child's surroundings endanger her physical or emotional well-being under subsection D and qualify as a "voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (citation omitted); *In re S.R.*, 452 S.W.3d 351, 361–62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). A parent's continued drug use after the child's removal is conduct that risks parental rights and may be considered as supporting an endangering course of conduct under E. *See Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal in the face of drug testing, jeopardized her relationship with her child).

With respect to subsection D, Mother contends that "[w]hile the Department may have 'concerns' about the aunts' capabilities, no evidence was presented as to how the aunt's care 'endangered' N.P." We disagree. Although the record is clear that N.P.'s aunts loved her, and the Department was able to rule out that her aunts hit her in the eye, which was the reason for the initial intake, the record was replete with evidence regarding N.P.'s unaddressed speech impediment, developmental

15

delay, educational issues, and dental issues. *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at \*19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (noting in context of best interest determination "[a] child's basic needs include routine medical and dental care[]") (citations omitted) (mem. op.); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at \*4 (Tex. App.—Fort Worth, Oct. 1, 2015, no pet.) (mem. op.) (in the context of D and E noting that the children's untreated medical conditions and developmental condition supported endangerment finding). None of these needs were being met while N.P. lived with her aunts. Moreover, Mother failed to give the aunts the necessary tools to deal with any of these issues in the form of a guardianship or other legal documentation to provide them the authority to address these issues. During the time Mother left N.P. with her relatives, the record established Mother also was using drugs, and the Department could not locate Mother at the time of removal.

Through the caseworker's testimony, the Department established that after N.P. came into the Department's care, she underwent educational testing, required extensive dental work, required speech therapy, needed a special education program, and that medical testing resulted in her being diagnosed with a chromosomal issue. Mother's decision to leave N.P. with her "developmentally delayed" relatives and neglecting to provide any documentation needed for them to care for N.P.'s extensive dental, medical, and educational problems was enough for the trial court

16

to conclude that Mother had exposed N.P. to risk of loss or injury. *See Boyd*, 727 S.W.2d at 533. "Neglect can be as dangerous to the [child's] well-being as direct physical abuse." *In re S.B.*, 597 S.W.3d 571, 584 (Tex. App.—Amarillo 2020, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996) (per curiam)). The evidence established Mother disregarded the potential danger to N.P. created by leaving N.P. in this environment. *In re I.V.H.*, 2019 WL 4677363, at *5. This, coupled with Mother's drug use and inaccessibility, supported the trial court's determination that Mother knowingly placed or knowingly allowed N.P. to remain in conditions or surroundings which endangered N.P.'s physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D).

With respect to subsection E, the trial court heard evidence of Mother's ongoing drug use. "[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Specifically, the evidence established, in the form of the caseworker's testimony and drug tests admitted at trial, that after the Department removed N.P. and during the pendency of this case, Mother tested positive for drugs. The evidence further established that in May 2020, months after Mother's positive drug test, she prematurely gave birth to another child who tested positive for amphetamines at birth. This established a voluntary and deliberate course of conduct by Mother. *See In re C.V.L.*, 591 S.W.3d at 751. The caseworker explained that there

were concerns about Mother's ongoing drug use and homelessness. Mother's continued drug use after N.P.'s removal and during her pregnancy with another child is conduct that risked her parental rights and may be considered as supporting an endangering course of conduct. *See Cervantes-Peterson*, 221 S.W.3d at 253; *see also In re S.R.*, 452 S.W.3d at 361–62. The caseworker further testified that Mother acknowledged she needed help and repeatedly indicated she was not able to care for N.P. The caseworker and the CASA representative outlined their attempts to assist Mother and explained she did not accept the offered assistance.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could reasonably have formed a firm belief or conviction that Mother (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered her physical or emotional well-being and (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *see also In re J.F.C.*, 96 S.W.3d at 266; *In re J.T.G.*, 121 S.W.3d at 125. We overrule Mother's issues.

## Conclusion

We conclude the evidence was legally and factually sufficient to support the trial court's endangerment findings under subsections D and E. Having overruled the Mother's two issues, we affirm the trial court's termination order.

18

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on December 21, 2020
Opinion Delivered January 21, 2021

Before Kreger, Horton, and Johnson, JJ.