

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00022-CV

_____

IN THE INTEREST OF J.G., J.G., J.G., AND J.Z., CHILDREN

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-579672-15

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Mother and Father both appealed the trial court's terminations of their parental rights after a bench trial. The trial court terminated Mother's parental rights to her four children—J.G (Andrew), J.G. (Benson), J.G. (Charlotte), and J.Z. (Jane)[1]—based on findings that she had endangered them under termination grounds (D) and (E) and that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). The trial court terminated Father's parental rights to his three children—Andrew, Benson, and Charlotte—based on findings that he had endangered them under termination grounds (D) and (E) and that termination was in the children's best interest.[2] *See id.* We will affirm.

## I. MOTHER'S APPEAL

Mother's appointed appellate counsel filed an *Anders* brief stating that there are no arguable grounds for appeal and also filed a motion to withdraw as Mother's attorney of record. *See Anders v. California*, 386 U.S. 738, 744, 87 S. Ct. 1396, 1400 (1967); *see also In re K.M.*, 98 S.W.3d 774, 776–77 (Tex. App.—Fort Worth 2003, no pet.) (holding that *Anders* procedures apply in cases terminating parental rights).

---

[1]We use initials or aliases for the names of the children and their family members to protect the children's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

[2]Jane's father—Evan—also had his parental rights terminated as to her, but he did not appeal.

The brief meets the *Anders* requirements by presenting a professional evaluation of the record and demonstrating why there are no arguable grounds to be advanced on appeal. Further, Mother's counsel (1) provided Mother with a copy of the *Anders* brief, (2) informed Mother of her rights to file a pro se response and to seek discretionary review from the supreme court, and (3) advised Mother of her right to access the appellate record from our court and provided her with instructions and a draft motion for obtaining the record. *See Kelly v. State*, 436 S.W.3d 313, 319–20 (Tex. Crim. App. 2014). Mother did not file a response, and the Texas Department of Family and Protective Services (Department) declined to file a brief.

When an *Anders* brief is filed, we must independently examine the record to determine if any arguable grounds for appeal exist. *In re C.J.*, 501 S.W.3d 254, 255 (Tex. App.—Fort Worth 2016, pets. denied). Our examination should consider the record, the briefs, and any pro se response. *In re L.B.*, No. 02-19-00407-CV, 2020 WL 1809505, at *1 (Tex. App.—Fort Worth Apr. 9, 2020, no pet.) (mem. op.).

After careful review, we agree with Mother's counsel that there are no arguable grounds for appeal in Mother's case. We affirm the trial court's judgment terminating Mother's parental rights. However, we deny the motion to withdraw filed by Mother's attorney because it does not show good cause for withdrawal. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016) (order); *C.J.*, 501 S.W.3d at 255. Thus, Mother's counsel remains appointed in this case through any proceedings in the supreme court unless otherwise relieved of these duties. *See P.M.*, 520 S.W.3d at 27.

## II. FATHER'S APPEAL

Father raises eight issues on appeal: (1) the trial court abused its discretion in denying his motion to appear at trial electronically; (2) he did not receive proper notice of the date that the trial was set to reconvene on January 11, 2024; (3) the trial court abused its discretion by failing to place his children in his care after the State of Michigan approved their placement with him; (4) the evidence was legally and factually insufficient to support termination on (D) grounds; (5) the evidence was legally and factually insufficient to support termination on (E) grounds; (6) the evidence was legally and factually insufficient to support termination on (N) grounds; (7) the evidence was legally and factually insufficient to support termination on (O) grounds; and (8) the evidence was legally and factually insufficient to support the trial court's finding that termination of his parental rights was in his children's best interest.

### A. BACKGROUND

### 1. Previous Conservatorship Cases

In 2015, Mother filed a petition requesting that she and Father be named joint managing conservators of Andrew, Benson, and Charlotte with Mother having the right to designate their residence.[3]  On January 26, 2016, the trial court entered a default order in that case.  It appointed Mother as sole managing conservator of the

---

[3]Mother and Father were never married.

children and Father as possessory conservator. Father was ordered to have only supervised visitation with the children in the presence of a third party and to pay child support. By this time, Mother had started dating Evan; Jane was born in January 2017.

In August 2017, five-year-old Benson was taken to the hospital with unexplained, extensive injuries. Benson, who is autistic and nonverbal, had a fractured left arm, a healing fracture to his right arm, bleeding in his ear, bruising across his body, and a mark on his left arm that looked like it had been tied down. Mother had taken Benson to the hospital but provided no explanation for his injuries. She said that he might have been injured after attempting to retrieve toys that had been thrown behind his dresser. The hospital staff did not find this explanation plausible and diagnosed his injuries as having been caused by physical abuse.

The Department filed a petition for protection, conservatorship, and termination on August 28, 2017 (the First Petition), and the children were removed from Mother's home. Mother initially told Department investigators that Evan did not live in her home with the children and had not been present when Benson was injured. She admitted later that Evan had been there when Benson was injured; she lied because she was worried that Evan would be judged by his criminal history and tattooed appearance. Evan also initially lied about having been in the house when Benson was injured and also eventually admitted to having been there, though he

5

denied ever hurting the child. The Department ultimately concluded that Evan had been the one to abuse Benson.

After the children's removal, the Department had some difficulty locating Father. A special investigator was able to locate him in North Richland Hills, Texas, by first contacting his mother, but the children had already been placed in foster care. The Department had concerns about placing the children with Father due to his history of substance abuse and his mental-health issues. Mother told a Department permanency specialist that, prior to her filing her conservatorship petition in 2015, she and Father's children had moved out of the home with Father and into a domestic violence shelter because of previous domestic violence between Father and her.

On October 30, 2019, the trial court entered its final order on the Department's First Petition, naming the Department as the permanent managing conservator (PMC) of all four children, but declining to terminate the parental rights of Mother, Father, and Evan. Instead, Mother was named possessory conservator of the children; Father and Evan were ordered to have no possession or unsupervised access to the children.

## 2. Current Termination Case

On January 31, 2023, the Department filed its petition for protection and termination in the instant case (the Second Petition). Attached to the Second Petition was an Affidavit for Termination of Parental Rights, in which a permanency specialist for the Department recommended that Mother, Father, and Evan all have their

6

parental rights terminated. She attested that the parents had failed, in the approximately four years since the Department had been named PMC of the children, "to make changes to their behaviors and circumstances to provide a safe and stable environment" for the children: Mother acknowledged the need to leave Evan for the safety of the children but failed to; Father continued to test positive for alcohol and marijuana and had not addressed his mental-health issues; and Evan had had minimal contact with the Department, had not visited his daughter Jane, and did not take responsibility for Benson's injuries.

The case proceeded to a bench trial, which occurred over two days on November 27, 2023, and January 11, 2024. What follows is a summary of the trial evidence relevant to Father's termination.

Father moved between Texas and Michigan several times during the pendency of the cases, though he lived solely in Michigan starting in at least August 2022.

All three of Father's children have medical diagnoses that raise myriad issues for their care. Andrew, who was six years old at initial removal, has been diagnosed with autism, attention deficit hyperactivity disorder, disruptive mood dysregulation disorder, adjustment disorder, mixed anxiety, and depressive mood. He takes at least four medications to deal with these diagnoses. Benson, who was five years old at removal, has been diagnosed with autism and is nonverbal. Charlotte, who was four years old at removal, is nonverbal, quadriplegic, and has eighteen medical diagnoses, including cerebral palsy, spina bifida, and chronic lung disease. She is fed and receives

7

her medications through a tube, has motor, developmental, and emotional delays, and requires round-the-clock care, which includes twelve hours of daily care from a home-health nurse.

As part of the previous case, a service plan had been created for Father which was updated throughout the life of both cases, and the Department continued to offer him services (in Texas and Michigan) related to that plan through the pendency of the instant case. Father's service plan recommended that he participate in a psychological assessment, attend counseling, complete a parenting class, participate in random drug screening, attend supervised visitation with his children, and find stable housing and work.

Father completed the parenting class and thirty days of inpatient substance-abuse therapy but did not complete any additional individual counseling. He reported that he had completed his psychological evaluation but provided the Department caseworker only portions of the assessment even after being asked for a complete copy of the assessment.[4] Father submitted to drug testing with some positive tests for alcohol and marijuana[5] as late as March 2023. He also tested positive for cocaine on one occasion but claimed that his hair sample had been contaminated by the testing

---

[4]Father texted images of only a few pages of the assessment to the caseworker, and she believed that he did this in an attempt to hide the full picture of his mental-health issues.

[5]Father lived in Michigan at the time, and marijuana use is legal there.

facility. Father struggled at times to maintain stable employment but started working at a Michigan tire factory in August 2023. His caseworker characterized this job as "relatively stable" compared to the instability of his prior employment history.

Father admitted to using marijuana and to having issues with alcohol abuse. He also told his Department caseworker that he had severe depression and anxiety so severe that he sometimes lost consciousness and had to seek treatment at the hospital. He reported having lost a job due to panic attacks and that he had ended up in the hospital on one occasion due to acute alcohol withdrawal after not drinking for a week. At one time Father had been prescribed medications for his mental-health issues, but stopped taking them because he did not "believe in prescription medication for mental health."

Initially, a home study via the Interstate Compact on the Placement of Children (ICPC) was conducted and approved by Michigan authorities for Father's children to be placed in his home. The Department denied this placement, however, after a caseworker traveled to Michigan and found the home to be inappropriate for the children. Father lived in his mother's home with his two brothers and two nieces. One of his brothers had severe mental-health issues but was not taking medication to help with those issues. Further, Father's mother had prior history that included charges for child abandonment and endangerment.

The house was cluttered and not handicap accessible for a wheelchair-bound child. There was marijuana paraphernalia and the strong odor of marijuana in the

9

house, and the caseworker saw this as problematic for a child with severe breathing issues. Nor did it appear that there was enough space for the children, as all of the bedrooms were already occupied. There was cat feces on the floor in the home, and the furnace was inoperable making the home too cold for the children.

Father lived at his mother's home only on the weekends because it was too far from his job at the tire factory and lived at another residence during the week. He stated that his mother and a cousin could help him care for the children. Father planned to move into his own apartment but never followed through with this plan and still lived in his mother's home at the time of trial.

Most of Father's visits with his children occurred remotely over Zoom, though he did come to Texas on at least one occasion for an in-person visit. Some of Father's behavior during these visits was concerning to the Department. While he appeared to be engaged with his oldest son, Andrew, he struggled to engage with his two nonverbal children, Benson and Charlotte. Charlotte communicates by making noises, and Father sometimes appeared to become agitated with her because the noises made it more difficult for him to engage with Andrew. Also, on one occasion, Father repeatedly asked Andrew if he wanted to live with Father, which made Andrew visibly upset. At this, Father became very angry, and the visit had to be ended prematurely. Andrew was hesitant to visit with Father following this interaction. A Department caseworker described Father as easily angered and that, at several of the Zoom visits, Father had yelled at his mother in view of the children.

At the in-person visit, Father would only change Benson's diaper when prompted by both a Department representative and a CASA representative, and he declined to change Charlotte's diaper even when asked to do so. When the Department attempted to schedule the in-person visit at 10:00 a.m. due to Charlotte's feeding schedule—which is very intensive and requires the use of a feeding tube—Father complained that this time was too early and that he would be too tired due to having a late flight into Texas the night before.

When it came time to feed Charlotte and to remove her from her wheelchair to perform walking exercises, Father did not attempt to help and even left the room. These behaviors led Department officials to be concerned that Father would not adequately care for Charlotte's dietary and mobility needs. Further, Father had declined to attend any treatment meetings for the children at which their caregivers discussed their emotional and medical needs. He stated that he did not want to attend the meetings because they involved discussions about the children's medication needs, which would make him angry. This concerned the Department because of Father's known opposition to prescription medications and refusal to take his own medications. There were fears that he would not ensure that his children took their required medications, which were numerous given their extensive medical issues.

Andrew, Benson, and Jane were placed together in a foster home. Charlotte was placed with another foster parent—a nurse who had cared for Charlotte since the beginning of the case. These foster homes were adoption-motivated. A CASA

11

representative reported to the trial court that the children were happy and thriving in their placements, receiving all of the medical care that they needed, and were in safe, stable environments.

### 3. Father's Request to Appear Remotely

Father appeared in-person at the first day of trial on November 27, 2023; he did not appear at the second day, on January 11, 2024. At the beginning of the second day of trial, Father's counsel announced that he had filed that morning an unopposed motion for Father to appear via Zoom or telephone because there had been "some confusion," and Father was in Michigan. The following exchange occurred between Father's counsel and the trial court:

> The Court: No. Denied. Should have been here. If it's - - it's really important for him to be here, [counsel].
>
> [Counsel]: Yes, sir.
>
> The Court: Right?
>
> [Counsel]: I agree.
>
> The Court: And you knew that before today.
>
> [Counsel]: I actually didn't know he was not going to be here until yesterday and I was in mediation when he called.
>
> The Court: Okay. The answer is no.

The issue was addressed again after the Department closed its case and Father's counsel was asked if he had anything further to present:

[Counsel]: My client was available by phone, Your Honor. I think there was some confusion on his part, at least from what he relayed to me, as to when this was reset for. I'm not assigning any blame. I did request that he appear via Zoom or telephonically and the Court denied that, so I have no further –

The Court: Well, you – you asked me today. You could have asked me another day or –

[Counsel]: Yes, sir.

The Court: – he could have made arrangements another day. But I would think that this is one of the most important things in his life –

[Counsel]: I understand.

The Court: – that he would make every effort to be here.

[Counsel]: And I wasn't made aware of it until yesterday.

The Court: I understand.

[Counsel]: Yes, sir.

The Court: So – all right. Thank you.

## B. DISCUSSION

### 1. Denial of Zoom Appearance

In his first issue, Father contends that the trial court abused its discretion by denying him the opportunity to appear at trial remotely. We disagree.

A trial court's ruling on a party's request to participate at trial by alternative means is reviewed for an abuse of discretion. *Nikolenko v. Nikolenko*, No. 01-20-00284-CV, 2022 WL 479988, at *9 (Tex. App.—Houston [1st Dist.] Feb. 17, 2022, pet. denied) (mem. op.); *In re J.D.*, No. 13-16-00062-CV, 2016 WL 3068260, at *3

13

(Tex. App.—Corpus Christi–Edinburg May 26, 2016, no pet.) (mem. op.). A trial court abuses its discretion if it acts unreasonably or arbitrarily or without reference to any guiding rules or principles. *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991).

Generally, a party must appear at all court proceedings in person, unless the trial court's notice states otherwise. Tex. R. Civ. P. 21d(b)(1). While Rule 21(d) provides that the trial court "may allow" a party to appear by videoconference, teleconference, or other means, it in no way obligates the court to do so. *Id.*; *see Grant v. Handal*, No. 08-23-00336-CV, 2024 WL 1723948, at *2 (Tex. App.—El Paso Apr. 22, 2024, no pet. h.) (mem. op.). Further, Texas courts have held that a parent does not have an absolute right to appear remotely in a termination case. *J.D.*, 2016 WL 3068260, at *3; *In re C.P.V.Y.*, 315 S.W.3d 260, 270 (Tex. App.—Beaumont 2010, no pet.).

Father did not request to appear by Zoom or telephonically until the morning of the second day of trial. Given that he made this request at the eleventh hour and had no absolute right to appear remotely, we hold that the trial court did not abuse its discretion by denying this request. We overrule Father's first issue.

## 2. Notice of Trial's Second Day

In his second issue, Father contends that he did not receive proper notice that trial was set to reconvene on January 11, 2024. Father waived this issue due to inadequate briefing.

14

Rule 38.1 of the Texas Rules of Appellate Procedure contains specific requirements for an appellant's brief. *See* Tex. R. App. P. 38.1. To comply with Rule 38.1, an appellant's brief must, among other things, contain a clear and concise argument for the contentions made, with appropriate citations to legal authority and to the record. Tex. R. App. P. 38.1(i); *In re A.N.G.*, 631 S.W.3d 471, 476 (Tex. App.—El Paso 2021, no pet.). Merely uttering brief, conclusory statements unsupported by citation to legal authorities does not satisfy briefing requirements. *A.N.G.*, 631 S.W.3d at 476; *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). Indeed, "[f]ailure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint." *Valadez*, 238 S.W.3d at 845.

In reviewing for briefing waiver, we are required to construe briefs liberally so that the right to appellate review is not lost by waiver. *In re I.J.K.*, No. 08-22-00055-CV, 2023 WL 3153645, at *4 (Tex. App.—El Paso Apr. 28, 2023, pet. denied) (mem. op.) (citing *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020)). Similarly, we should hesitate to resolve cases on procedural defects and instead work to resolve cases on their merits. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d. 211, 213–14 (Tex. 2020). Even still, "[w]e are not responsible for identifying possible trial court error, searching the record for facts favorable to a party's position, or conducting legal research to support a party's contentions." *In re J.O.A.M.*, No. 01-23-00691-CV, 2024 WL 1169432, at *23 (Tex. App.—Houston [1st

15

Dist.] Mar. 19, 2024, no pet.) (mem. op.). "Were we to engage in such activities, we would be abandoning our role as judges and taking on the role of advocate for that party." *Id.* (citing *Valadez*, 238 S.W.3d at 845).

In the section of Father's appellant's brief titled "Issues Presented," he lists as his second issue that he did not receive proper notice of the January 11, 2024 trial date. And in his Statement of Facts section, he asserts that he was unaware of that date. However, in his Argument section, Father does not address or discuss this issue whatsoever. His brief does not present any substantive analysis or citation to legal authority to support his contention that he lacked notice of the January 11, 2024 trial setting. For these reasons, we hold that Father waived his second issue due to inadequate briefing.[6] *See J.O.A.M.*, 2024 WL 1169432, at \*23.

### 3. Placement of Children With Father In Michigan

Father lists as his third issue in the "Issues Presented" section of his appellant's brief that the trial court abused its discretion by failing to place the children in his care after Michigan authorities approved an ICPC placement with him. His "Statement of Facts" section briefly mentions that Michigan approved the placement and that Texas rejected it. The rest of his appellant's brief is devoid of any other mention of this

---

[6]Even if Father had properly briefed the issue, his attorney's knowledge of the January 11, 2024 date would have been imputed to him. *See In re S.H.*, No. 2-05-174-CV, 2006 WL 59354, at \*2 (Tex. App.—Fort Worth Jan. 12, 2006, no pet.) (mem. op.) ("An attorney's knowledge of a trial setting is imputed to his client."). His attorney appeared at the second day of trial and made no mention of or objection related to not having been adequately notified of the setting.

issue. There is no substantive analysis or citation to legal authority to support his contention that the trial court abused its discretion by failing to place the children in his care. For these reasons, we hold that Father waived his third issue due to inadequate briefing.[7] *See id.*

## 4. Evidentiary Sufficiency

In his fourth through eighth issues, Father contends that the evidence was legally and factually insufficient to support the trial court's findings as to termination grounds (D), (E), (N), and (O), and its finding that termination was in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O), (2). We disagree.

### a. Standard of review

For a trial court to terminate a parent–child relationship, the party seeking termination—in this case the Department—must prove two elements by clear and convincing evidence: 1) that the parent's actions satisfy one termination ground listed in Texas Family Code Section 161.001(b)(1); and 2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

---

[7]Father also did not properly preserve his third issue for appellate review. The record does not show that Father ever raised this complaint to the trial court with a timely request, objection, or motion. *See* Tex. R. App. P. 33.1(a).

17

conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the alleged termination ground and that termination of the parent–child relationship would be in the children's best interest. Tex. Fam. Code

18

Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

If the evidence is factually sufficient, then it is necessarily legally sufficient as well. *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op).

### b. Applicable law

The trial court terminated Father's parental rights under (D) and (E) endangerment grounds. We may conduct a consolidated review of findings related to (D) and (E) grounds when the evidence pertaining to both is interrelated, as it is here. *See In re A.B.-G.*, No. 02-19-00066-CV, 2019 WL 3755770, at *8 (Tex. App.—Fort Worth Aug. 8, 2019, pet. denied) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d 494, 503 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g).

Under (D), we examine evidence related to the children's environment to determine if that environment endangered their physical or emotional well-being. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). A parent's conduct in the home, including abusive or violent conduct, can create an environment endangering the children's physical and emotional well-being. *Id.* The relevant timeframe under (D) is endangerment to the children that occurred before they were removed from the parent's care. *In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied).

19

Under (E), we ask whether evidence exists that the parent's conduct—including acts, omissions, or failures to act—endangered the children's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Additionally, (E) requires not just a single act or omission but rather a voluntary, deliberate, and conscious course of conduct. *Id.* The conduct may occur both before or after the children have been removed from the parent's care. *I.D.G.*, 579 S.W.3d at 851.

Although "'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," it does not require that there be conduct directed at the children or that the children actually suffer injury. *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). Evidence that a person has engaged in abusive and violent conduct in the past permits an inference that the person will continue to engage in violent behavior in the future. *In re M.D.M.*, 579 S.W.3d 744, 765 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Use of drugs and alcohol and their effects on a parent's life and his ability to parent may be endangering. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Likewise, a parent's mental state and failure to seek mental-health treatment may be considered in determining whether a child is endangered if the parent's mental state demonstrates an inability to provide the child with a safe and stable environment. *Id.*; *see In re K.G.*, 350 S.W.3d 338, 355 (Tex. App.—Fort Worth 2011, pet. denied). A parent might also endanger his children by subjecting them to uncertainty, instability, or inappropriate living conditions. *In re L.E.R.*, 650 S.W.3d 771, 783–84 (Tex. App.—Houston [14th

20

Dist.] 2022, no pet.); *T.D. v. Tex. Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.). Finally, a parent's refusal to participate in a Department-requested service plan can be considered in the endangerment analysis. *T.D.*, 683 S.W.3d at 915.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### c.  (D) and (E) grounds

The following evidence establishes that the trial court's findings as to (D) and (E) grounds were supported by factually (and, thus, legally) sufficient evidence:

- Mother reported to the Department that she had stopped living with Father and had taken the children to live in a domestic violence shelter because there was ongoing domestic violence in the home.

- Father admitted to the Department that he had issues with abusing alcohol and marijuana.

- Father went to the hospital due to having alcohol withdrawals.

22

- Father tested positive for alcohol, marijuana, and cocaine while the instant case was pending.

- Father's children had emotional and medical diagnoses that required substantial resources and accommodations.

- The Department had concerns that the house where Father lived and where he planned to place his children was not appropriate for children with such severe emotional and medical needs. It smelled strongly of marijuana, had drug paraphernalia in open view, had cat feces on the floor, had an inoperable furnace, was cluttered, was not handicap accessible, and did not have enough bedrooms.

- Father's relatives who lived at the house raised concerns of their own: his brother had severe mental-health issues for which he did not take medication and his mother and cousin had prior criminal history related to child abandonment and endangerment.

- Father lived at a different residence during the week and stated that his Mother or other relatives would help him care for the children.

- Father had severe depression and an anxiety disorder so severe that he sometimes lost consciousness and required medical attention.

- Father did not take medication or attend counseling to help with his mental-health issues. And he did not believe in using medication to help address these issues.

- Though Father seemed engaged with Andrew during visitations, Department officials had concerns about his lack of engagement with Benson and Charlotte. He did not seem interested in changing their diapers, using the feeding tube to feed Charlotte, or participating in her walking exercises.

- The Department described Father as easily angered. He became visibly angry at his mother while on Zoom visits with the children. He also became agitated with Charlotte due to the noises she makes and angry when Andrew became upset at Father's repeated interrogation about whether Andrew wanted to live with Father.

- Father did not attend the children's treatment meetings because he became angry when discussing prescription medications. The Department had concerns that Father would not adequately care for the Children's medical needs or ensure that they took their medications.

- Though Father completed a parenting class and an inpatient substance-abuse program pursuant to his service plan, he never provided full documentation of his psychiatric assessment, attended individual counseling, or made ongoing efforts to control his substance dependencies and mental-health issues. He also struggled to maintain stable employment throughout the pendency of the case, though at the time of trial he seemed to have a stable job.

Based on the entire record, we hold that the trial court could have reasonably formed a firm conviction or belief that Father had engaged in conduct or had knowingly allowed Andrew, Benson, and Charlotte to remain in conditions or surroundings that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *C.H.*, 89 S.W.3d at 28. We overrule Father's fourth and fifth issues.

### d. (N) and (O) grounds

In his sixth and seventh issues, Father contends that the evidence was legally and factually insufficient to support the trial court's findings terminating his parental rights under grounds (N) and (O). However, the trial court did not terminate Father's parental rights on (N) or (O) grounds, only on (D) and (E) grounds. Accordingly, we overrule Father's sixth and seventh issues.

24

### e. Best interest

In his eighth issue, Father argues that the evidence was legally and factually insufficient to support the trial court's finding that termination of his parental rights was in Andrew's, Benson's, and Charlotte's best interest. Again, we disagree. We organize our discussion of this issue within the framework of the relevant *Holley* factors. *See* 544 S.W.2d at 371–72.

- Second and fourth *Holley* factors (the children's current and future emotional and physical needs and Father's parenting abilities): Andrew, Benson, and Charlotte had significant emotional and physical needs. The Department had concerns that Father did not have the resources, desire, and parenting ability to ensure that these needs would be met. Further, Father had failed to complete his service plan even though the Department had made efforts to make those services available to him in Michigan.

- Third and sixth *Holley* factors (current and future emotional and physical danger to the children and Father's acts or omissions suggesting parent–child relationship improper): There was evidence that Father had engaged in domestic violence toward Mother while he lived with the children. Further, Father admitted to having a problem with alcohol abuse and had tested positive for cocaine and marijuana on random drug tests. He also had significant mental-health issues that he refused to properly treat with counseling and medication. His refusal to treat his own medical issues raised concerns with the Department that he would likewise refuse to see that the children's medical needs were met. Father also exhibited concerning anger issues around the children.

- Fifth *Holley* factor (Father's and the Department's plans for the children, including the stability of the proposed home or placement): Father's plans were for the children to move into his mother's home, even though he did not live there during the week. The Department presented evidence to show that his mother's home was not appropriate for the children: there was cat feces on the floor and drug paraphernalia in open view, it was not handicap accessible, the furnace was out and it was cold, all of the bedrooms were occupied by other family members, and other adults in the home had untreated mental-

25

health issues and prior charges for child abandonment and endangerment. Father told the Department that he planned to move into his own apartment, but he had not done so at the time of trial. On the other hand, the children were in stable, adoption-motivated foster homes, and Charlotte's foster mother was a nurse who had the skills and resources to appropriately care for her.

Based on the entire record in light of the *Holley* factors, we hold that the evidence was sufficient for the trial court to have reasonably formed a firm conviction or belief that termination of Father's parental rights was in Andrew's, Benson's, and Charlotte's best interest. *See* Tex. Fam. Code. Ann. § 161.001(b)(2); *C.H.*, 89 S.W.3d at 28. We overrule Father's eighth issue.

### III. CONCLUSION

We affirm the trial court's judgment terminating Mother's parental rights but deny Mother's counsel's motion to withdraw. Having overruled all of Father's issues, we affirm the judgment of the trial court terminating his parental rights.

/s/ Brian Walker

Brian Walker
Justice

Delivered: June 13, 2024